UNITED STATES of America for the
Use of E & R CONSTRUCTION
CO., INC., Plaintiff,

v.

GUY H. JAMES CONSTRUCTION CO.
and Federal Insurance Company,
Defendants.

Civ. A. No. 504.

United States District Court,
M. D. Tennessee,
Northeastern Division.

Sept. 5, 1972.

John K. Maddin, Jr., Nashville, Tenn., Edward Gallagher, Washington, D. C., for plaintiff.

J. Olin White, Nashville, Tenn., Thomas R. Brett, Tulsa, Okl., C. J. Watts, Oklahoma City, Okl., for defendants.

## MEMORANDUM OPINION

MORTON, District Judge.

This action was commenced on September 28, 1967, by plaintiff E & R Construction Co., Inc. based upon the provisions of the Miller Act, 40 U.S.C. §§ 270a and 270b. The plaintiff is an Ohio corporation. Defendant, Guy H. James Construction Company, is an Oklahoma corporation, and defendant Federal In-

surance Company is a New Jersey corporation which is authorized by the United States to write performance and payment bonds under the terms of the Miller Act.

On June 26, 1964, defendant Guy H. James Construction Company (hereinafter "James") entered into a prime contract with the United States Corps of Engineers providing for the construction of a project in Tennessee known as Cordell Hull Lock and Dam, consisting of a lock and dam on the Cumberland River, including items applicable to this action as follows:

(1) Construction of a lock with cofferdam surrounding the entire worksite, with an elevation of 480 feet around the lock excavation area, referred to as Stage I.

(2) Construction of a cofferdam around lower approach channel to an elevation of 456 feet, referred to as Stage II.

(3) Common excavation, consisting of removal of all earth, including the cofferdam, to final elevations, according to plans of U. S. Corps of Engineers.

The James contract was a successor to earlier contracts held by other parties for the initial excavation and construction of a cellular cofferdam in the dam area, and for road construction and site preparation, and preceded a subsequent contract for the completion of the dam and for construction of the powerhouse.

James, as principal, and Federal Insurance Company (hereinafter "Federal"), as surety, executed to the United States separate bonds, each in a penalty sum of $2,500,000, with performance bond conditioned for faithful performance of the contract, and payment bond conditioned for payment of all labor and material used in prosecution of the contract work.

On July 1, 1964, E & R Construction Company (hereinafter "E & R") entered into a subcontract with James for what may be described generally as the execution of the earth-moving or dirt excavation items under the prime contract. (A copy of the subcontract is included in the Appendix to this Opinion.)

The position of the prime contract undertaken by plaintiff can be more particularly described as follows:

| Item No. | Description | Estimated Quantity | Unit Price | Amount |
|---|---|---|---|---|
| 1 | Mobilization & Preparatory Work | | Lump Sum | $ 17,900 |
| 2 | Lock Cofferdam | 100,000 c.y. | 0.64 | 64,000 |
| 5 | Clearing & Grubbing | | Lump Sum | 11,000 |
| 6 | Common Excavation | 1,480,000 c.y. | 0.64 | 947,200 |
| 15 | Filter Drainage Layer | 5,200 c.y. | 5.28 | 27,456 |
| 16a | Compacted Impervious Fill | 86,000 c.y. | 0.14 | 12,040 |
| 17 | Random Fill | 103,000 c.y. | 0.08 | 8,240 |
| 18 | Coarse Rock Fill | 8,100 c.y. | 2.00 | 16,200 |
| 19 | Fine Rock Fill | 2,000 c.y. | 2.00 | 4,000 |
| 20 | 12-inch Concrete Pipe | 200 l.f. | 4.00 | 1,040 |
| 21 | 15-inch Concrete Pipe | 240 l.f. | 5.00 | 1,200 |
| 22 | Bedding for Riprap | 7,500 c.y. | 5.28 | 39,000 |
| 23 | Riprap | 24,500 c.y. | 1.50 | 36,750 |
| | | | | $1,187,266 [1] |

1. See Exhibit V of the record which shows the amounts actually paid to E & R by James. (Plaintiff's exhibits are numerical; defendants' exhibits are alphabetical.)

The cofferdam system which was utilized on the project was referred to as being in four parts: the "upstream" 480 dike, meaning an elevation of 480 feet; the "downstream" 480 dike; the downstream 456 dike (sometimes referred to as the 460 dike); and the cross-dike. The terms "upstream" and "downstream" are used in relation to a cellular cofferdam that had been constructed under a preceding contract. Stage I of the project refers to the upstream portion of the work; Stage II refers to the downstream portion of the work.[2] The removal of the 456 and 480 dikes, which was accomplished during the latter part of the work, is sometimes referred to as Stage III.

During the first part of the job E & R was responsible for the removal or excavation of the overburden on the rock underlying the Stage I area and the construction of the 480 dike; during the second part of the job E & R was responsible for the excavation or removal of the overburden on the rock underlying the Stage II area and the construction of the 456 dike; during the final part of the job E & R was responsible for the general maintenance of the dike system, and the eventual removal of the 456 dike, the 480 dikes, and the cross-dike.

The excavation or removal operations by E & R were planned as a use of certain mobile equipment and a dredge that E & R had purchased for this purpose. Stage I excavation was primarily completed with automotive-type earth-moving equipment, although towards the end of this stage a dredge was used to assist in the disposal of Stage I material. Stage II excavation, although begun at higher elevations with automotive-type equipment, was primarily a dredging operation. Stage III, the removal of cofferdams and dikes, was also primarily done by dredge. Stage II was begun before Stage I was completed, but there was a substantial time interval between the completion of Stage II and the commencement of Stage III.

This action is based on twelve separate claims or "items." Plaintiff claims James materially breached the parties' contract and that plaintiff is entitled to recover in *quantum meruit,* or, in the alternative, entitled to recover for the damages incurred.

## STATUTE OF LIMITATIONS DEFENSE

Defendants maintain that several items, i.e., Items (b), (c), (e), (f), (g), (h), (j), and (l) of No. 7 of plaintiff's amended complaint were asserted as claims against defendants for the first time in the amended complaint, filed on September 22, 1971, and they are barred by the one-year statute of limitations, 40 U.S.C. § 270b. Therefore, the threshold question for the court's determination is whether the alleged new claims asserted by plaintiff in the amended complaint are barred by the one-year statute of limitations provision in 40 U.S.C. § 270b which provides, in part:

"(b) . . . no such suit shall be commenced after the expiration of one year after the day on which the last of the labor was performed or material was supplied . . . ."

Defendants contend that in the original complaint filed in this action on September 28, 1967, plaintiff was proceeding on a theory of breach of contract and sought damages therefor. On September 22, 1971, plaintiff filed a motion to amend the complaint and specifically referred to seeking damages and recovery against the defendants for several items of claim on the basis of *quantum meruit* in addition to breach of contract. The court did not receive any pleadings in opposition to the plaintiff's motion to amend, and an order granting said motion was entered October 6, 1971. At trial defendants asserted as a defense that the claims based on a theory of *quantum meruit* were new and conse-

---

2. Occasionally Stage I is referred to in the record of this case as Phase I, and likewise, reference to Stage II as Phase II was also used.

quently time-barred under the Miller Act's one-year statute of limitations.

The court finds that the original complaint in this case covered all the items mentioned in the amended complaint. The amended complaint uses different language in part and is more specific. Additionally, the court finds that the original complaint contained the essential elements of a suit in *quantum meruit*. The court finds no substantive differences between the allegations in the original complaint and those in the amended complaint. In the original complaint jurisdiction is based on the Miller Act and specifically included are claims in reference to: refusal to pay for work performed, material change in plan of construction of cofferdam, unreasonable interference with performance of subcontract work by placing of shot rock, change in filter drainage material, failure to supply riprap bedding, material, and filter drainage material, change in location of access road, failure to supply coarse rock fill and other rock materials, interference with subcontractor's use of dredge, and failure to pay for additional excavation.

■ All items growing out of this same contract were mentioned in the original complaint, breach of contract based on interference was claimed, and relief was sought on the basis of work performed but not paid for, all of which can be interpreted as a claim based on *quantum meruit*. The court finds that the allegations of the original complaint contained the essential elements of a suit in *quantum meruit*.

The court finds the facts and claims asserted in the amended complaint are not barred by the one-year statute of limitations, but instead they fall within the scope of Rule 15(c) of the Federal Rules of Civil Procedure, which provides:

"Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. . . ." (Emphasis supplied.) 28 U.S.C., Fed.R.Civ.P. 15(c).[3]

Defendants contend that a change in the theory of recovery from breach of contract of *quantum meruit* is barred by the statute of limitations and is contrary to Tennessee procedural practice. Defendants cite Bubis v. Blackman, 58 Tenn.App. 619, 435 S.W.2d 492 (1968).

■ This court adopts the following reasoning and approach:

". . . [R]elation back is properly a question of *federal practice* under Rule 15(c), and the issue of whether an amendment will relate back should not be determined by resort to state law even in a nonfederal action, but

3. Reference should also be made to Rule 8(e)(2), providing for alternative pleading, and Rule 54(c), providing for liberal allowance of amendments to conform to the proof or evidence. The Second Circuit Court of Appeals has interpreted Rule 54(c) as follows:

". . . A simple statement in sequence of the events which have transpired, coupled with a direct claim by way of demand for judgment of what the plaintiff expects and hopes to recover, is a measure of clarity and safety; and even the demand for judgment loses its restrictive nature when the parties are at issue, for particular legal theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not. Federal Rules of Civil Procedure, rule 54(c), 28 U.S.C.A. following section 723c; Ring v. Spina, 2 Cir., 148 F.2d 647; United States, for Use of Susi Contracting Co. v. Zara Contracting Co., 2 Cir., 146 F.2d 606, and cases cited." Gins v. Mauser Plumbing Supply Co., 148 F.2d 974, 976 (2d Cir. 1945).

*See also* United States for use of Way Panama, S. A. v. Uhlhorn International, S. A., 238 F.Supp. 887 (D.C.Z.1965), aff'd and National Surety Corp. v. United States, 378 F.2d 294 (5th Cir. 1967), cert. denied 389 U.S. 1004, 88 S.Ct. 561, 19 L.Ed.2d 598 (1967); United States for Use of Ross v. Somers Construction Co., 184 F.Supp. 563 (D.Del. 1960); 84 A.L.R.2d 1072 (annotation in reference to recovery on *quantum meruit* where only express contract is pleaded, under Fed. R.Civ.P. 8 and 54).

should be decided in terms of Rule 15(c).

"While it is a general rule that an amendment which introduces an entirely new claim for relief will not relate back to the date of the original pleading, Rule 15(c) is not limited by the 'cause of action' concept, and an amendment which injects a new legal theory, within the scope of the original claim for relief, or adds another claim arising out of the transaction or occurrence set forth in the original pleading should relate back under the terms of Rule 15(c)." Moore, Federal Practice, § 15.15[3].

The purpose of the relation back rule embodied in Rule 15(c) is accomplished if the initial complaint gives the defendant fair notice that litigation is arising out of a special factual situation. *See, e. g.,* Longbottom v. Swaby, 397 F.2d 45 (5th Cir. 1968).

■ The relation back theory extends to Miller Act complaints. Security Insurance Co. v. United States, 338 F.2d 444 (9th Cir. 1964). The Ninth Circuit Court of Appeals applied the "relation back" theory and permitted the amendment, whether as an "amendment" to the complaint, or a "supplemental" complaint, holding that in either form, the new items or claims would not be barred, if they grow out of the same contract and bond. *Cf.* Ruckman & Hansen, Inc. v. Contracting and Material Co., 328 F.2d 744 (7th Cir. 1964); Russell v. New Amsterdam Casualty Co., 303 F.2d 674 (8th Cir. 1962); M. W. Zack Metal Co. v. The S. S. Birmingham City, 291 F.2d 451 (2d Cir. 1961); United States v. Russell, 241 F.2d 879 (1st Cir. 1957). *See also,* United States for Use and Benefit of Construction Products Corp. v. Bruce Construction Corp., 272 F.2d 62, 66 (5th Cir. 1959); National Surety Corp. v. United States, 378 F.2d 294 (5th Cir. 1967), cert. denied 389 U.S. 1004, 88 S.Ct. 561, 19 L. Ed.2d 598 (1967). *See* 10 A.L.R. Fed. 553.

The test under the express provisions of Rule 15(c) is whether the material representing the amendment grew out of the "same transaction or occurrence." Wright & Miller, Federal Practice and Procedure: Civil § 1497. *See e. g.,* Matarese v. Moore-McCormack Lines, 158 F.2d 631, 633, 634 (2d Cir. 1946); Bradbury v. Dennis, 368 F.2d 905 (10th Cir. 1966). In the case of Miller Act complaints it is reasonable to conclude that the same contract or bond is equivalent in meaning to the same transaction or occurrence. *Compare* Security Insurance Co. v. United States, *supra,* and United States v. Home Indemnity Insurance Co., 246 F.Supp. 27 (E.D.Pa.1965), involving a suit on contracts and bonds other than those relied upon in the originally filed complaint.

■ Finally, in a supplemental memorandum filed by defendant, an argument is made that because of alleged differences between the original complaint and the amended complaint, plaintiff is estopped from filing the amended complaint. The court finds that Rule 8(e)(2) of the Federal Rules of Civil Procedure disposes of this asserted defense:

"A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal, equitable, or maritime grounds." 28 U.S. C., Fed.R.Civ.P. 8(e)(2).

Accordingly, it is the holding of this court that none of the claims asserted by plaintiff in the amended complaint are barred by the one-year statute of limitations provided in the Miller Act, 40 U. S.C. § 270b.

## Item (a). SHOT ROCK CLAIM

Plaintiff claims that James wrongfully interfered with the performance of E & R's subcontract work by dumping excavated rock and blasted rock into areas which plaintiff was subsequently required to dredge, and thereby increased the cost of E & R's subcontract work. E & R maintains that the alleged wrongful interference by James caused substantial injury to E & R, and plaintiff seeks to recover $222,468.59 for property damage to its dredge and for 1,108 hours of down time due to said damage.

Defendant denies that E & R has any right to recovery, and it maintains that plaintiff had no contractual right to expect a rock-free cofferdam. Defendant contends that plaintiff, as an experienced contractor, was charged with knowledge that rock plating is customarily used on cofferdams on lock and dam projects in order to provide a hard surfaced haul road along the top of the cofferdam and to establish erosion control along the sides.

The initial excavation under the James contract with the Corps of Engineers was in the lock area, Stage I. This excavation was performed by E & R under its subcontract, and was done by earth-moving machinery. As the depth of the excavation increased, the water content in the soil and the winter season weather began to retard E & R's progress of excavation in Stage I. At this time, E & R proposed a dredging operation in Stage II which would enable crawler pans, working in Stage I, to haul the material a short distance to Stage II and dump it to the dredge. James tendered E & R's proposal to the Corps of Engineers and permission was granted by the Corps to allow E & R to use its dredge in Stage II under certain restrictions which were later to be established.[4]

During the first dredging operation for E & R on this job, E & R averaged 5,608 cubic yards of material dredged per day. The only rock E & R encountered was near the cross-dike which had been excavated by James in Stage I and inadvertently picked up by E & R's crawler pans and hauled to the Stage II dredge pit together with the 75,000 cubic yards of earth moved by that method.

The dredge was permitted to excavate in the Stage II area until it reached Station $12 + 50B$, at which point the dredge was taken out of the dredge pit and sent to Uniontown, Ohio, to work on a different project (July 28, 1965). E & R then closed the dredge access to the Stage II excavation and pumped out the water. Under the contract it was the responsibility of James to excavate the rock from the floor of both the Stage I and Stage II areas.

James began the Stage II rock excavation on November 3, 1965. The rock excavation was begun at the extreme downstream end of the dredge pit, and the disposition of the first rock which was blasted loose was to bulldoze it into a rock ramp on the landward side of the 456 dike. When the rock ramp was such that it reached to the top of the 456 dike, James began hauling rock out of the hole with dump trucks. At this point, James disposed of a considerable quantity of shot rock by dumping it on the 456 dike in a layer from two to four feet thick, such as to construct a roadway from the access ramp on the 456 dike to the point where the cross-dike intersected the 456 dike.

In addition to dumping shot rock on the 456 dike in order to construct a haul road and allegedly provide erosion safety, James also used the 456 dike as a convenient means of disposing of the excavated shot rock, rather than hauling it away to designated spoil areas. After dumping rock on the 456 dike, James hauled several loads of rock over the cross-dike and then to one of the designated spoil areas.

4. The restrictions which were subsequently imposed by the Corps are fully discussed in this opinion under plaintiff's claim entitled, "Item (c). ARBITRARY DREDGE LIMITS," page 51.

Prior to James' rock excavation operation in the Stage II dredge pit, James had deposited a crushed rock roadway along the course of the downstream 480 dike and on the cross-dike, to which E & R had no objection since crushed stone presented no problem for E & R's anticipated dredging operation. At a later date in the course of the rock excavation from the Stage II dredge pit, James hauled shot rock from Stage II to a point on the downstream 480 river dike, and utilized that rock to construct a ramp which angled off the 480 dike to the bottom of the Stage I pit near the cellular cofferdam.[5]

In October of 1965, E & R excavated a large hollow spot in the landslide of the 456 dike at its point of intersection with the permanent riprap slope, Station 22 + 10B, to enable E & R to riprap that slope in the dry. Upon completion of that excavation, and while putting the riprap in place, E & R sent a letter to James asking for cross-section measurements to be made in that area so that E & R could be reimbursed for the additional hauling to refill the excavated area. In December of 1965 James filled the entire area with shot rock which it hauled out of Stage II. At the same time, James laid a layer of shot rock to connect this area with the previously constructed shot rock roadway. In addition to purposefully dumping shot rock on the cofferdam and cross-dike, defendant also scattered rock about the area during its blasting operation.

E & R, through its project superintendent, Ernest Ward, objected and protested immediately to each of the instances in which shot rock was placed onto either the 480 dike or the 456 dike. On each occasion George Green, the project manager for James, represented to Ward that James would remove all of the rock from both dikes prior to the date on which E & R would resume dredging operations.

On July 11, 1966, the dredge returned to the project from Uniontown, Ohio, after first undergoing a complete overhaul in Nashville, Tennessee. E & R had notified James that the dredge was en route and asked that the rock be removed from the dikes prior to its arrival. James assured E & R that the shot rock would be removed. Upon the arrival of the dredge, the project was not far enough along to permit breaching and flooding of the lock cofferdam area, so the prime contractor directed E & R to dredge along the periphery of the 480 dike, after having lowered it to elevation 460 by conventional means, and further directed E & R to maintain a consistent width and consistent two to one slope as the peripheral dredging was executed.

As the cofferdam removal phase of the excavation was begun, E & R encountered some difficulty with shot rock in the dike system, which became worse as the excavation proceeded. E & R's job superintendent Ward vigorously complained to George Green that it was encountering rock difficulties and demanded that James expedite the removal of the rock from the cofferdam system. Defendant's efforts to remove the rock were ineffective. For example, James' personnel intentionally dumped rock below the water line adjacent to the cofferdam rather than wait for trucks to return from spoil areas to pick up another load. (See Exhibits 32–44.) E & R continued to complain to James about the rock in and on the cofferdams and in the water next to the bank of the cofferdam. James sent a work crew on several occasions and attempted to remove more rock with the use of a dragline and hand labor.

Normally the dredge pumps water and earth, including sand and gravel, through the cutterhead, up into the pump, through the impeller, and out the discharge line where the solid particles are deposited and the water runs off or

---

5. Reference is made to Exhibit 26, which is a chart showing the areas where James dumped the shot rock (shown in red on the chart), and which also shows the areas where James used crushed stone on the 480 dike (shown in yellow) rather than the shot rock.

evaporates. As E & R dredged out the cofferdams, shot rock jammed in the cutterhead, intake line, cleanout tee, pump casing and throughout the 3,000 foot discharge line. When the rock jammed in the cutterhead, it was necessary to cease dredging operations and send men out in a motorboat with crowbars and hammers to extricate the offending rock or rocks. In an attempt to keep shot rock from coming into the dredge's system, E & R installed protection bars in the cutterhead. The rocks would occasionally jam in the rubber intake line causing it to blow off of its flange coupling, and causing extraordinary deterioration of the hose fibers. Reinstallation or replacement was both a time-consuming and expensive operation. (See Exhibit 122 which is a compilation of the down time of the dredge due to shot rock problems.) Some of the rock was removable through an access door in a cleanout "T" immediately preceding the pump casing. The most serious difficulty occurred when the rock became lodged in the pump casing itself, which necessitated lengthy shutdowns and difficult extrication procedures. When this occurred, the entire pump, main engine and dredge would experience severe vibration which caused metal stress and ultimate metal failure in both moving and stationary parts.

The shot rock caused severe problems on the 14-inch diameter discharge line. The rock would frequently jam in the line, necessitating welding operations to remove the section of the pipe, remove the rock and reweld the hole previously cut for access. The abrasive and hammering effect of the rock tumbling through the discharge line caused numerous weak spots which eventually would blow open under the high pressures being utilized to move the material over the 100-foot lift into the discharge area. The rock would pile up in the discharge area, necessitating additional sections of pipe to be added periodically in order to keep from blocking the discharge end.

The proof was uncontroverted that E & R's dredging difficulty became worse as the dredging operation progressed on the job site. This fact existed because the dredging began in the area of the partially contaminated 480 dike and proceeded towards the completely contaminated 456 dike.

Ward realized that James would excavate the rock by blasting operations; however, Ward reasonably assumed that the dislodged and scattered rock would be hauled away before E & R was expected to begin carrying out its responsibilities of removing the adjacent material which constituted the surrounding lock cofferdam system. At trial the thrust of plaintiff's claim against defendant's blasting procedure was that it was negligently carried out by using too large a charge. The evidence was substantially uncontroverted that defendant carried out its blasting operations in a normal manner, consistent with similar blasting operations. However, the proof did show that defendant neglected to cover the blasting area which resulted in the rock being scattered over a wide area and defendant failed to properly collect and carry away the displaced rock which was thrown upon the adjacent area which plaintiff was required to subsequently dredge. Ward protested to Green about the rock that was cast upon the cofferdam by the blasting.

Although plaintiff did not prove that defendant carried out its blasting operations negligently, the evidence is clear that James' blasting operation was a contributing cause with its dumping operation of distributing shot rock on the cofferdam.

The court finds that in addition to any rock which was scattered by blasting about plaintiff's proposed dredging area, defendant placed rock over the cofferdam system in order to use such as a rock-plated haul road on top, and additionally, James dumped rock on the sides of the cofferdams allegedly to establish a plating for anti-erosion purposes. However, the court finds that such in-

tent was not contemplated by defendant's or Corps' personnel until the time of trial. Such a purpose could not be attained by dumping shot rock on the landward slope of the cofferdam, which was part of the area where James dumped shot rock.

Prior to trial, defendant's witnesses in pretrial depositions made no reference to the use of rock plating, of any sort, on cofferdams for erosion purposes. In all of its pretrial pleadings, defendant only referred to the use of rock for haul road purposes. The court finds that the erosion control purpose which was referred to by several of the defendant's witnesses was the result of the realization that plaintiff had successfully proved that at least one of these areas where shot rock was placed or dumped, allegedly for the purpose of constructing a haul road, was only used by James for several days thereafter.

In light of the above findings of fact, the court summarizes as follows:

1. After E & R had completed the construction of the downstream (456 cofferdam, certain rock excavation was performed by James adjacent to the cofferdam, during the course of which it dumped large quantities of shot rock on the surface and slopes of the cofferdam. James did not use designated spoil areas for the disposal of rock until after it had completed the dumping operation on the cofferdam. Additionally, as a consequence of blasting, rock was scattered over the area by James during its rock excavation work.

2. Immediate protests concerning all of these operations of James were made by E & R. Representatives of James made continuing promises of assurance to plaintiff that James would be responsible for removing the rock from the cofferdam; however, its attempts to accomplish the removal of the rock from the cofferdam were ineffectual.

3. At all times James was aware of E & R's intention to remove the cofferdam by hydraulic dredging and was aware from its own knowledge and pro-

tests of E & R that the presence of shot rock on the cofferdam would materially interfere with E & R's performance of its contractual duties.

In Miller Act actions, federal substantive law controls over state law; however, "interstices may be filled by incorporating state law." United States for Use and Benefit of Astro Cleaning & Packaging Corp. v. Jamison Company, 425 F.2d 1281, 1282, n.1 (6th Cir. 1970). See also United States for Use and Benefit of Shields, Inc. v. Citizens and Southern National Bank of Atlanta, 367 F.2d 473, 477 (4th Cir. 1966); Central Steel Erection Co. v. Will, 304 F.2d 548, 554 (9th Cir. 1952). No distinction is made between state and federal substantive law in this opinion because the principles applied appear to be valid federal and Tennessee law.

The general rule is that public contracts are to be strictly construed and nothing passes by implication. Volunteer Electric Co-op. v. Tennessee Valley Authority, 139 F.Supp. 22 (E.D. Tenn.1954). However, there is also a substantive rule of law that parties to a construction-type contract impliedly agree that the contractor shall be furnished with the site of the work necessary to perform his contract. Each party to a contract is under an implied obligation to restrain from doing any act that would delay or prevent the other party's performance of the contract. Fritz-Rumer-Cooke Co. v. United States, 279 F.2d 200, 201 (6th Cir. 1960). A party who is engaged to do work has a right to proceed free of let or hindrance of the other party, and if such other party interferes, hinders, and prevents the doing of the work to such an extent as to render the performance difficult and largely diminish the profits, the first may treat the contract as broken and is not bound to proceed under the added burdens and increased expense. Anvil Mining Co. v. Humble, 153 U.S. 540, 14 S.Ct. 876, 38 L.Ed. 814 (1894). In the present action, E & R elected to complete performance even though

James materially interfered with its ability to do so.

Defendant maintains that this item should be rejected because there is no affirmative prohibition in the specifications against placing or spoiling the shot rock in a way that interfered with plaintiff's excavation and removal work; also that plaintiff knew or should have known the rock would be dumped on the cofferdam system for the purpose of haul roads and/or erosion control.

The subcontract provided:

"4) SUBCONTRACTOR has inspected the work site, and does not rely upon representations of CONTRACTOR, beyond terms of the prime contract, etc., as to any matter incident to this subcontract."

In a decision by the United States Supreme Court, a contractor was required "to examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance." The court reasoned that:

". . . [t]he obligation to examine the site did not impose upon him the duty of making a diligent inquiry into the history of the locality, with a view to determining, at his peril, whether the sewer specifically prescribed by the government would prove adequate. The duty to check plans did not impose the obligation to pass upon their adequacy to accomplish the purpose in view. And the provision concerning contractor's responsibility cannot be construed as abridging rights arising under specific provisions of the contract." United States v. Spearin, 248 U.S. 132, 137, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918).

The court awarded damages on what amounted to a *quantum meruit* basis, and specifically according to the formula enunciated in United States v. Behan, 110 U.S. 338, 4 S.Ct. 81, 28 L.Ed. 168 (1884).

The Corps of Engineers' borings of the area were of two types, wash borings and core borings. The first type of boring would not show the presence of rock in the area, but the second type would show the presence of rock. Core borings taken by the Corps of Engineers indicated that the material in the area of the Cordell Hull project was suitable for dredging and generally free of rock. Prior to the bid letting, the plaintiff took hand auger core borings along the edge of the Hardaway excavation (which had been carried out under a previous contract) at various elevations to the level of bedrock, and encountered no rock. Occasionally, rocks which were alluvial in origin were encountered by the dredge, but being round and smooth did not present any serious dredging problem; whereas shot rock is extremely rough in shape with sharp, pointed edges which did cause a serious dredging problem.

The test borings that were conducted by the Corps and E & R did not evidence the existence of any rock which E & R could expect to encounter during its earth excavation. Paragraph 4 of the subcontract required E & R to inspect the worksite and accept the reasonable working conditions, without reliance upon representations by James. James maintains that such an inspection would have indicated to E & R that James would be required to build and maintain hard-surfaced haul roads along the cofferdam and dike, and demonstrate the necessity of James to conduct blasting operations in order to perform rock excavation for the dam site. The court believes that this is a reasonable assertion by the defendant, which was, in fact, realized and anticipated by E & R; however, it was not foreseeable that James would use shot rock to accomplish such purposes and it was not reasonable to assume that James would use the cofferdam as a spoil area for the rock which it excavated. The evidence is clear that alluvial rock did not amount to a contributing cause to E & R's dredging problems. Additionally, the court does not agree with defendant's assertion that the proof demonstrates that plaintiff's dredging problems were partially caused by rock · which had been blasted from

road-building operations carried out across the river on an earlier construction contract.

Defendants aver that the broad general rule is that one who has contracted to perform specific work for a stated price will not be entitled to extra compensation because he encounters difficulties that have not been provided against in the contract. As referred to by the Sixth Circuit Court of Appeals, "the rule is often stated, although seldom followed . . . ." United States v. Ross Corporation, 385 F.2d 564, 566 (6th Cir. 1967), and citations contained therein. The facts of the present case do not demonstrate that plaintiff neglected to foresee a difficulty due to a natural condition, but, instead, the unforeseen condition arose and existed solely because of the wrongful conduct of the defendant James.

Defendants have suggested that the specifications applicable here required or allowed the use of the shot rock, as it was used by James. For this reason it is necessary to consider the terms of the specifications. Relied upon by defendants are pages 2–4 of the specifications, Paragraph 2–02(b)(2)(i), which refers solely to the "Powerhouse Cofferdam" portion of the work, which was practically the last step in the James prime contract, and involved repositioning certain cells of the original cellular cofferdam, and constructing a timber crib cofferdam, as depicted in the photograph introduced as Exhibit 217.

"2–02. DESCRIPTION OF COFFERDAM

\* \* \* \* \* \*

"(b) *New Work.*

\* \* \* \* \* \*

"(2) Powerhouse.—Prior to the removal of the cofferdam for the lock and dam the contractor shall construct that portion of the powerhouse as indicated on contract drawing Q16–19/5.

i. Rock Cap.—The entire cofferdam shall be topped with rock as indicated on the drawing. Care shall be taken in the placement of rock to prevent damage to cells or interlocks. Rock shall be reasonably well graded from the minimum size permitted, weighing approximately 15 pounds, to the maximum size stone permitted, weighing approximately 300 pounds. The quality of the rock shall be such that it will not disintegrate and will properly protect the top of the cofferdam from weather and traffic for a period of approximately three years. Sufficient spalls shall be used as a top layer to produce a reasonably smooth surface suitable for truck traffic."

The "lock cofferdam," which is the subject of this suit, is an altogether different cofferdam, and is described in Par. 2–02(b)(1), with no reference to a "rock cap," nor did any of James' drawings indicate a rock cap on the lock cofferdam. Of interest in this connection are Exhibits 135, K, and the testimony of witnesses Marcum (Tr. 1284–1287) and Abbott (Tr. 1145–1154), all of which make clear that the provision relied upon by defendants relates only to the later-to-be-constructed "Powerhouse Cofferdam" and not the lock cofferdam involved in this case.

The evidence was substantial that cofferdams on lock and dam projects are generally "topped" with rock.[6] After reviewing the entire record, the court finds that there is a custom within the construction and excavation trade that rock topping of some sort on cofferdams is generally employed to provide use as a haul road and also for plating the river side of a cofferdam during a lock and dam project. The record is deficient as to any regularity in the actual size and type of rock or stone that is used for such topping and plating.

---

6. According to an expert's testimony, Elmer Gardner, an experienced general contractor with the government on lock and dam projects, "topped" means placing rock not only on the roadway system that exists on top of cofferdams, but plating also "on the outside clear down to where they [Corps of Engineers] figure they would have any erosion problem." (Tr. 839)

The Corps of Engineers' resident engineer, Lester Marcum, testified that it has been his experience to observe that ". . . all cofferdams have been used as access ways and roadways and have been paved with some material or other. They have been hard topped as a matter of access." (Tr. 1344) Although defendants' witnesses were fairly consistent in their testimony that a plating of some kind is usually placed on the top and outer face of cofferdams, the witnesses failed to testify that shot rock is used for such a purpose.[7] The record also fails to reflect the conditions, requirements and specifications which were applicable to the other jobs alluded to by the witnesses.[8] The court finds that James did prove a usage in the trade; however, it failed to prove a custom within the trade of using shot rock on cofferdams.

 Testimony of what is usually or generally done is not of the imperative, compulsory and universal character required to establish a custom. Bagwell v. Susman, 165 F.2d 412 (6th Cir. 1948). Existence of usage or custom can only be proved by numerous instances of actual practices, and not by opinion of a witness. A person seeking to establish custom or usage has the burden of proving it by evidence so clear, uncontradictory and distinct as to leave no doubt as to its nature and character. California Fruit Exchange v. Henry, 89 F.Supp. 580 (W.D.Pa.1950), aff'd 184 F.2d 517 (3rd Cir. 1950). Proof of certain isolated instances is not sufficient to establish a usage or custom. Premier Electric Construction Co. v. Miller-Davis Co., 291 F.Supp. 295 (N.D.Ill.1968), aff'd 422 F.2d 1132 (7th Cir. 1970), cert. denied 400 U.S. 828, 91 S.Ct. 56, 27 L.Ed.2d 59 (1970).

 "Usage" is a repetition of acts, and differs from "custom" in that the latter is the law or general rule which arises from such repetition; while there may be usage without custom, there cannot be a custom without a usage accompanying or preceding it. American Lead Pencil Co. v. Nashville C. & St. L. Ry., 124 Tenn. 57, 134 S.W. 613 (1911).

Even assuming that disposal of shot rock is used as part of the custom within the trade, then the question is: what is the effect of the defendant's continuing promise to remove the shot rock and its ineffectual attempts to remove same? James' representatives continually made promises of assurance to E & R that the rock would be removed prior to E & R commencing its dredging operations. James used its dragline trucks and a crew of men on several occasions in attempting to remove the rock. James' removal operations were ineffectual and carried out in a negligent manner at best. For example, James' work crew dumped shot rock into the water adjacent to the bank of the cofferdam when waiting for dump trucks to return from a designated spoil area. When asked to describe his protestations to Green when he had observed the James dragline and hand laborers being used for dumping rock picked up from the cofferdam into the river, Ward testified that ". . . his [Green's] reaction was just that he was going to do it. That was all there was to it. There wasn't any way I could stop him. Q. Do you remember what he said to you? A. That he had work to do and he was going to put the material over there." (Tr. 155) See also letter of August 12, 1966, Exhibit A, and letter of August 17, 1966, Exhibit B. Ward later stated, "All I know sir, I told him don't do it to me, you are really going to hurt my

---

7. James Abbott, an experienced engineer, referred to the use of crushed stone as a plating for a cofferdam to foster erosion control purposes. (Tr. 1134–35) Witness Bennett referred to the use of crushed rock or broken-up rock for plating haul roads. (Tr.

1119) Elmer Gardner failed to distinguish between crushed stone and shot rock.

8. The lack of consistency in establishing the trade custom is evident from the accurate summary of the testimony as outlined in Plaintiff's Post-Trial Reply Brief, B–4.

dredge operation, and he said he has got work to do down there and he was going to do it." (Tr. 160).

In light of the facts and circumstances of the present case, the court holds that defendant is estopped from asserting the alleged trade custom in defense of its conduct. James' conduct evidences its recognition that it was responsible to E & R because it had abandoned the usual and normal procedure of any trade custom of "topping" or "plating" a cofferdam.

Defendant's main witness, George Green, testified that the rock would have had to be removed in order to avoid damage to the dredge. "I recognized it had to be properly removed or it would cause damage to the dredge." (Tr. 995) In response to a letter from E & R requesting immediate removal of the shot rock from the cofferdam, Green replied in a letter dated October 17, 1965 (Exhibit 212), "We did try to do exactly what we had formerly advised you we would do . . . ", i. e., remove the shot rock. James knew what the consequences would be to the dredge if shot rock were placed on the cofferdam system, but it willfully proceeded to do so. It subsequently promised to remove the rock, but its removal efforts were negligible.

Defendant James insists that its promise to remove the rock was an unenforceable "voluntary commitment" which was without consideration and not legally binding. However, the court finds that plaintiff did give valid consideration. Plaintiff could have abandoned or rescinded the contract upon recognizing the material breach of contract which was caused by defendant. Instead, plaintiff attempted to perform as expeditiously as possible in order to comply with the defendant's continuing requests that E & R complete its work under the contract and as required by Para. 5 of the subcontract.

"5) SUBCONTRACTOR shall exercise due diligence and reasonable care to perform upon request by contractor; and complete the subcontract part of the work within such time as the work of CONTRACTOR or other subcontractors shall not be delayed; . . ." Exhibit 131.

The court holds that James' conduct, in attempting to remove the shot rock, was not a gratuitous act, but evidence of a promise to perform on the part of James. James acknowledged its responsibility for the unwarranted presence of the shot rock on the cofferdam. E & R reasonably relied upon James' promise to remove the shot rock and the court therefore holds that James is equitably estopped from denying that the promise is without legal effect.

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement of Contracts, § 90; Corbin, Vol. 1A, § 204.

The gravamen of the doctrine of equitable estoppel is that the party pleading the doctrine had been induced to rely upon certain representations, not that he had been fully aware of the consequences of reliance should it prove to have been mistaken, and that the conduct of the person who made the representations had been such as to induce the party to change his position in good faith, or such that a reasonable man would have relied on the misrepresentations. *See generally* United States v. Reliance Insurance Co., 436 F.2d 1366, 11 A.L.R.Fed. 911 (10th Cir. 1971).

Because the Miller Act does not furnish a cause of action in *quantum meruit* in disregard of the provisions of an express contract, to the extent that a remedy in *quantum meruit* is provided by applicable state contract law, such a remedy may be asserted in a suit under the Miller Act. United States v. Premier Contractors, Inc., 283 F.Supp. 343, 349 (D.Me.1968), and citations contained therein.

Defendant brought itself within the rule first enunciated in such decisions of the United States Supreme Court as United States v. Smith, 94 U.S. 214, 24 L.Ed. 115 (1877); United States v. Barlow, 184 U.S. 123, 22 S.Ct. 468, 46 L.Ed. 463 (1902); United States v. Behan, *supra*; and particularly Anvil Mining Co. v. Humble, *supra*, wherein it was said,

"A party who engages to do work has a right to proceed free from any let or hindrance of the other party, and, if such other party interferes, hinders, and prevents the doing of the work to such an extent as to render its performance difficult and largely diminish the profits, the first may treat the contract as broken, and is not bound to proceed under the added burdens and increased expense." 153 U.S. 540, at 552, 14 S.Ct. 876, at 880, 38 L.Ed. 814.

In *Behan* it was said that when a party prevents the other from performing, it is estopped from denying the injured party has been damaged; and in *Barlow*, the court said that the interference with work of driving piles by the drophammer process was the "exercise of superintendence and unwarrantable superintendence"; that it was "improper interference, . . . in a legal sense." 184 U.S. 123, 137, 22 S.Ct. 468, 474, 46 L.Ed. 463.

In United States v. Smith, *supra*, the interference was an unwarranted suspension of work, and damages were awarded on this basis. It does not appear that there was an express provision in the contract prohibiting suspension of the work. And in *Barlow* the Secretary of the Navy ordered certain changes in the way piles were being driven. There is no indication that the contract in that case affirmatively barred such an order, yet damages were awarded on a *quantum meruit* basis on the ground that this constituted improper interference on the part of the defendant. A breach may occur, even in the absence of an express contract provision barring the act causing the breach.

Defendant materially interfered with the performance of the subcontractor work of E & R when it failed to remove promptly the large quantities of shot rock which it had wrongfully deposited on the cofferdam system. This was a material breach of the subcontract which had the effect of a revision and abandonment of the contract by defendants, thus justifying the plaintiff to proceed in *quantum meruit*. James' conduct constituted a breach that was "so substantial and fundamental as to go to the very root of the contract." United States v. Southern Construction Co., 293 F.2d 493, 498 *dictum* (6th Cir. 1961); Anvil Mining Co. v. Humble, *supra*; United States v. Behan, *supra*; United States v. Barlow, *supra*; United States v. Smith, *supra*; United States for Use of Susi Contracting Co. v. Zara Contracting Co., 146 F.2d 606 (2d Cir. 1944). *See* United States v. Ross Corporation, *supra*, 385 F.2d at 567, for a decision by the Sixth Circuit Court of Appeals which applied the principle laid down by the Supreme Court of the United States which allowed recovery for a wrongful interference or concealment of a material condition.

Accordingly, the court holds that E & R is entitled to recover under *quantum meruit* because of James' material breach of contract. The court holds that the circumstances described above constituted a gross and material interference with the right of E & R to conduct its work free from such interference, and thus constituted a breach of contract on the part of James, which breach by James increased the cost of performing the work, and the reasonable value of the services rendered by E & R.

*Damages—Shot Rock Claim*

One who voluntarily and wrongfully interferes with performance by the other party is estopped from denying the injured party has been damaged to the extent of his actual loss and damage incurred. United States v. Behan, *supra*.

As a consequence of the shot rock difficulties, E & R's dredge was only able to excavate 1124 cubic yards per day

while removing the cofferdam, compared with the 5608 cubic yards dredged per day as achieved in 1965 during its previous dredging operations on this work site. The dredge and all of its accessories, when purchased new at the beginning of the Cordell Hull project, cost E & R $313,925. E & R operated the dredge on a 22-hour basis with a four-man day shift and a three-man night shift which, when averaged, resulted in a direct wage cost of $12.13 per hour. Each hour of down time cost E & R $135.27. During the cofferdam removal phase of the dredging, E & R suffered 1,108.25 hours of down time as a direct consequence of shot rock difficulties and damage, which when multiplied by the $135.27 figure, results in a net loss to E & R of $149,912.98. E & R also expended $13,570.28 for repair parts purchased from the American Marine and Machinery Company, which were utilized to repair shot rock damaged components in the dredge. E & R expended $16,978.82 for replacement pipe, hose, and repair materials purchased from other sources which were attributed to shot rock damage to the dredge and its accessories. In addition, E & R expended $691.99 for extra labor (personnel in addition to the regular dredge crew whose wages were included in the $135.27 calculation), and $433.25 for machinery costs used in conjunction with repairs made to the system as a consequence of shot rock difficulties.[9] Total damages were therefore as follows:

Down time: 1108.25 hours at $135.27 per hour ......... $149,912.98

AMMCO repair parts .............................. 13,570.28

Pipe, hose, and material purchased from other sources ... 16,978.82

Extra labor ..................................... 691.99

Machinery utilized in repair effort .................... 433.25

Total ................................. $181,787.32

9. To determine this figure, it is necessary to match the machinery and hours as shown in Exhibit 128 (Ward, Tr. 106) with the rates shown on Exhibit 206 (Pletz, Tr. 497–501), and calculate as follows:

| Date | Equipment (Exhibit 128) | Hours (Exh. 128) | Rate (Exh. 206) | Total |
|------|------------------------|------------------|-----------------|-------|
| 7/18 | Truck Mounted Crane | 10.0 | 11.00 | 110.00 |
| 7/19 | Truck Mounted Crane | 12.5 | 11.00 | 137.50 |
| 8/1 | Welding Truck | 3.0 | 1.00 | 3.00 |
| 8/2 | Welding Truck | 4.0 | 1.00 | 4.00 |
| 8/3 | Welding Truck | 3.25 | 1.00 | 3.25 |
| 8/6 | Welding Truck | 2.0 | 1.00 | 2.00 |
| 8/20 | Welding Truck | 4.5 | 1.00 | 4.50 |
| 8/20 | H–D 11 Dozer | 2.0 | 7.00 | 14.00 |
| 8/22 | Welding Truck | 4.5 | 1.00 | 4.50 |
| 8/22 | H–D 11 Dozer | 4.5 | 7.00 | 31.50 |
| 8/22 | Welding Truck | 3.5 | 1.00 | 3.50 |
| 8/22 | H–D 11 Dozer | 3.5 | 7.00 | 24.50 |
| 8/23 | Northwest Crane | 3.5 | 11.00 | 38.50 |
| 8/23 | Welding Truck | 3.0 | 1.00 | 3.00 |
| 9/13 | Welding Truck | 8.5 | 1.00 | 8.50 |
| 10/14 | Welding Truck | 8.0 | 1.00 | 8.00 |
| 10/21 | Welding Truck | 11.0 | 1.00 | 11.00 |
| 10/26 | Welding Truck | 3.0 | 1.00 | 3.00 |
| 11/26 | Welding Truck | 8.0 | 1.00 | 8.00 |
| 11/28 | Welding Truck | 11.0 | 1.00 | 11.00 |
| | | | | 433.25 |

Defendant argues in its post trial brief that plaintiff neglected to take into account the "cost of ownership" concept of damages for idle equipment, i. e., one-third of the rental value. Defendant neglected to recall the testimony that the idle equipment rate would not be applicable to dredge down time because it was required to be kept operational with a crew due to the fact that it would be dangerous to do otherwise. (Tr. 525–526).

Defendant also asserted that plaintiff failed to take into account and make proper allowances for normal down time. The evidence is clear that such allowances were made and taken into account.

Reference is made to Exhibit E, Plaintiff's Answers to Defendant's Interrogatories, and particularly to the answer to Interrogatory No. 17(e):

> "Yes; the dredge was down approximately 125 hours between July 12, 1966 through January 7, 1967 for routine repairs performed by Plaintiff's personnel which were not charged to or attributable to the shot rock problem. Repair parts and services totaling $11,052.49 were purchased from AMMCO between July 1, 1966 through January 7, 1967 which were not attributable to or charged to the shot rock problem."

*Mitigation*

The calculation of the amount of the loss to E & R as a consequence of shot rock problems was uncontroverted at trial. The court finds that the source of this loss was the direct consequence of the wrongful conduct of the defendant. In lieu of presenting offsetting evidence directed at the cost of plaintiff's losses, defendant argues that plaintiff failed to mitigate its damages.

The burden of showing that plaintiff could have mitigated its damages after defendant's breach of contract is on defendant. Tampa Electric Company v. Nashville Coal Company, 214 F.Supp. 647, 652 (M.D.Tenn.1963). James maintains that the choice of an efficient method of excavation rested with E & R, which should have used a method of removal other than dredging for that part of the work where the existence of rock may have made dredging unfeasible, and that proper excavating procedure would have indicated that the dredge should have been preceded by a dragline to locate and remove shot rock. James contends that if E & R had brought in large draglines, mounted in barges, complete with the necessary tugs and trucks, the substantial additional dredging cost could have been mitigated. The proof showed, however, that E & R did not have any large draglines, or barges, or tugs, and was generally not equipped to perform the excavation in any manner other than the manner which had been originally planned several years earlier. No showing was made one way or the other whether E & R could have raised the capital necessary to obtain this equipment, found other work for its dredge, which had been purchased for this job, and completed the cofferdam excavation with draglines and clam shell buckets for less than the increased cost which they incurred by continuing with the dredging operation.

The court finds that E & R had no opportunity to realize the full impact of James' conduct of dumping shot rock on the cofferdam until E & R's dredging operation was at a point of no return. The dredge originally was used on the least contaminated section of the cofferdam. E & R was promised by representatives of James that the shot rock would be removed. James' work crew and equipment was observed making efforts to remove the rock. The work crew removed the larger and more apparent shot rock which had previously been observed, although a great amount of this rock was also dumped into the water along the bank of the cofferdam. E & R reasonably relied upon James' assurances that the shot rock had been successfully removed. Under these circumstances the court finds that it was unreasonable to expect that E & R should have been able to anticipate the rock damage which it subsequently en-

countered due to the rock which had become submerged underwater along the base of the cofferdam and which had blended with the ground which made up the cofferdam. The remaining rock was undetectable as to its amount and actual location; however, it was in an area which was required to be excavated by E & R. (Tr. 172–73, 184–88).

■ The court holds that James failed to carry its burden of proof on mitigation of damages because it did not demonstrate by a preponderance of the evidence that the alternative method of removal was feasible or had any likelihood of success. Defendant failed to offer any convincing evidence to this court that a dragline or clam mounted on a barge would have effectively removed the shot rock. In fact, the court finds that there was some doubt as to the ability to even float a barge in the channel. (Tr. 173) Homer Manley, defendant's strongest witness in support of the proposition that there was an alternative means of removing the rock, when asked whether a clam shell could have removed all the rock, responded: "Well, perhaps it could." (Tr. 1099).

The court also finds that defendant failed to carry its burden of proof that the alternative method would have been less expensive for E & R. The only evidence which defendant offered on this matter was the testimony of Manley that he would estimate that the cost of removal would be "a couple hundred dollars" per hundred foot. (Tr. 1103). The court is unable to place much reliance in the accuracy of this estimate.

In a case before the Second Circuit Court of Appeals a defendant argued that the construction method used by the plaintiff was not the best or most economical. The court reasoned:

"Even if Scaduto's mode of operation was improper, Orlando, whose agents were in constant supervision of the project, appears largely to have acquiesced in it from the beginning of the work in July, 1955, to April, 1956, and took no steps to change it.

Under such circumstances, Orlando may be held to have waived any fault in Scaduto's manner of operation." Scaduto v. Orlando, 381 F.2d 587, 593 (2d Cir. 1967), citing United States for Use of Susi Contracting Co. v. Zara Contracting Co., *supra*, 146 F.2d at 608.

Defendant proffered no evidence that it attempted to stop E & R from using a dredge to remove the shot-rock-contaminated cofferdam; instead, the proof clearly shows that James insisted upon E & R's completion without interruption or delay.

The defendant maintains that E & R's dredging difficulties were complicated by "inexperience of Plaintiff's management personnel, particularly its Dredge Captain, Ron Ward, who was 22 years of age, with two years of experience." The court finds this assertion to be without merit or substance. Although the evidence in the record reflects that the dredge captain was only 22 years of age at the time of this job, there is no evidence that he operated the dredge in a negligent manner. He was directed to continue with the use of the dredge, after the shot rock problems arose, by his superior, E. Ward, who was relying upon the promises of James that the rock would be removed.

Defendant's conduct of dumping shot rock in plaintiff's dredging area was in careless disregard of the contract rights of plaintiff, and constitutes a material breach of the contract by defendant in connection with a substantial part of the work. It is an example of interference with plaintiff's operations, within the meaning of legal interference as it has been defined by the United States Supreme Court in *Barlow* and *Anvil Mining* and the other cases already cited. Plaintiff is clearly entitled to recover in *quantum meruit* the increased cost occasioned by the presence of the shot rock, which includes damage to equipment and unanticipated delay.

■ In reference to the argument that E & R should have been using a

dragline operation, or at least should have changed to a dragline, instead of continuing to use the dredge, the record shows that defendant knew that plaintiff was going to use a dredge to remove the cofferdam and cross-dike. E & R invested $313,925 in a dredge. James tendered no evidence that any of its personnel recommended to E & R to change the manner of its operation when rock difficulties were encountered. In light of the factual background, the court finds that James was obligated to remove the rock and that if a dragline mounted on a barge was an adequate means of accomplishing this objective, then James should have adopted this method. Plaintiff was free to choose its own mode of operation without let or hindrance from defendant, but when defendant took on the responsibility of unjustifiably interfering with plaintiff's operation, it took on the responsibility for any damage caused by its own conduct. After standing by and watching the dredge operation as long as it did during the initial stages, James waived any possible right to insist on some other mode of operation on the part of the plaintiff. Scaduto v. Orlando, supra, 381 F.2d at 593.

In summary, James had materially breached the contract by its wrongful conduct. E & R could have elected to rescind or abandon its duty to complete its performance under the contract upon defendant's breach. United States v. Atlantic Dredging Co., 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920). Instead, E & R attempted to complete performance and in its attempt to avoid the consequences of James' breach, E & R incurred losses and additional expenses which are recoverable as damages. Restatement of Contracts, § 336(2), Tampa Electric Co. v. Nashville Coal Co., 214 F.Supp. 647, 652 (M.D.Tenn.1963). The court finds that plaintiff's decision to complete performance was reasonable in light of the circumstances and factual background of this case. Tampa Electric Co. v. Nashville Coal Co., supra, at 652.

Accordingly, the court holds that E & R is entitled to recover One Hundred Eighty-One Thousand Seven Hundred Eighty-Seven Dollars and Thirty-Two Cents ($181,787.32) under this claim.

### Item (b). ITEM 2 CLAIM

Under this claim plaintiff maintains that it was not paid according to the terms of the parties' contract, and, in the alternative, that there was no meeting of the minds as to the terms of the subcontract regarding performance and payment for plaintiff's work done under this item. (See Subcontract attached hereto in the Appendix, Supplement, pages 1 and 2.)

James was paid on a lump sum basis $230,000 by the government for all work performed under Item 2 of its prime contract with the Corps of Engineers. E & R was paid $10,259.20 for Item 2 under its subcontract with James.

Item 2 is listed in the subcontract as follows:

| Item No. | Description | Estimated Quantity | Unit Price | Amount |
|---|---|---|---|---|
| 2 | Lock cofferdam | 100,000 c.y. | 0.64 | 64,000.00 |

The parties stipulated as follows:

"4. A cofferdam system was 'placed' (Use-Plaintiff insists same was 'built' and Defendants insist that same was 'completed' by the addition of materials to existing soil) around the construction area which, through the course of the project, was referred to by both the Use-Plaintiff and the Defendants as being in four parts, the upstream 480 dike, the downstream 480 dike, the downstream 456 dike

(sometimes called the 460 dike) and the cross-dike.

"5. The cofferdam system was 'placed' by stripping the vegetation from the existing earth along with its attached soil, replacing the stripped material, and various other steps including the addition of 16,030 cubic yards of earth to the existing soil and final grading and sloping the total dike system into its finished form."

James was to pay E & R for building the cofferdam system by taking final cross-section measurements of the completed cofferdam system. James paid E & R for a total of 16,030 cubic yards of material which had been added to the natural terrain to bring the cofferdam and cross-dike to final grade. Plaintiff maintains that it is entitled to payment on the basis of the total quantities of material within the completed cofferdam and cross-dike which should include the natural terrain down to the bedrock. If plaintiff's theory of construction were adopted, it would be entitled to payment on the basis of the following quantities:

(a) Upstream 480 dike—20 feet wide on top, 220 feet wide on the bottom, with 2 to 1 slopes on both sides, from toe to toe, containing 65,293 cubic yards;

(b) Downstream 480 dike—20 feet wide on top, 220 feet wide on the bottom, with 2 to 1 slopes on both sides, from toe to toe, containing 150,533 cubic yards;

(c) Downstream 456 dike—20 feet wide on top, 120 feet wide on the bottom, with 2 to 1 slopes on both sides, from toe to toe, containing 55,940 cubic yards;

(d) Cross-dike—100 feet wide on top, 280 feet wide on the bottom, with 2 to 1 slopes on both sides, from toe to toe, containing 103,822 cubic yards of earth. (Had the 100 foot wide cross-dike been constructed to the same elevation, with the same slopes, but with its top only 20 feet wide, it would have contained 57,142 cubic yards of earth rather than 103,822 cubic yards.)

The issue before the court on this claim is whether payment to E & R for work done under Item 2 on the basis of cross-section measurements is to only include the material required to be added to the natural terrain to bring the cofferdam system to final lines, grades and slopes, or whether the final cross-section measurements are to include both the added material and the natural material which already existed in the embankments.

Defendant maintains that the subcontract only requires that plaintiff be paid for material actually moved to bring the cofferdam up to the planned elevation; whereas plaintiff maintains that it is entitled to be paid for the entire quantity of material which composed the final cofferdam.

Plaintiff maintains that the subcontract is ambiguous as to payment under this item and that the parties had no meeting of the minds as to their respective understanding of this term of their contract. The court was presented with contradictory evidence as to the circumstances and background surrounding the parties' negotiations, intent, and interpretation of the final bargain and contract. See Corbin on Contracts, Vol. 3, §§ 536, 543. E & R's prime negotiator for the subcontract was William Ward, who at the time of trial was hospitalized and totally incapacitated by a severe stroke. James' prime negotiator was Mr. Harold Rice, who was Chairman of the Board of Directors of James until a month and a half before trial. Neither individual was present at the trial.

Under both the prime contract (Exhibit 1) and the subcontract (Exhibit 131), Item 6 was common excavation and Item 2 was the lock cofferdam. When E & R prepared its first bid on Item 2, lock cofferdams and dikes, it did so for the Perini Corporation, one of the competing and unsuccessful bidders for the Cordell Hull contract. Perini de-

scribed a dike system very similar to the one which James ultimately directed E & R to build. The most significant difference between the two proposed dike systems was the elevation of the section of cofferdam downstream of the cross-dike, which James intended to build only to elevation 456; whereas Perini planned to build it to 480.

Although the Corps of Engineers had designated Item 2 as a lump sum bid item in the prime contract, Perini requested E & R to submit its subcontract bid on the basis of a determinable constant. It was understood by E & R that large quantities of dirt would not need to be hauled in to build the dike system, but that there would be a great deal of pumping, grading, sloping and maintenance-related activities over a several-year period which would cost the subcontractor a substantial sum of money, and which would not be adequately measured by the amount of material moved from and onto the cofferdam and cross-dike.

Perini's engineers calculated that the dike system, when completed, would contain 279,000 cubic yards of earth, not counting the cross-dike, and allegedly including the natural earth. Their calculations were checked by E & R, and it was allegedly understood by both Perini and E & R that most of the 279,000 cubic yards involved in the dike system were already along the river bank.

Perini asked E & R to give them a per cubic yard bid to remove the cofferdams at the end of the job, within which E & R would necessarily have to include the cost of its entire effort in carrying out its responsibilities under Item 2. (Exhibit 2, pp. 2–6, para. 2–06.) As a removal item, the paylines under Item 2 would not affect the paylines under Item 6, common excavation, which was to be paid for based on the quantity as determined by Corps of Engineers cross-sections of the material between a line indicating original ground elevation and a line indicating final ground elevation.

When James was announced as the successful bidder, E & R submitted the bid which it had prepared for Perini to James. The first bid submitted by E & R was for Item 2 to be paid as a removal item, but as an item which would not affect Item 6 quantities. Rice, James' prime negotiator, told Bill Ward, E & R's negotiator, that the estimated 279,000 cubic yards of material was "not in the ball park," and he counter-offered an estimated quantity of 100,000 cubic yards of material. After further discussion, argument and compromise, the parties finally agreed on an estimated quantity of 100,000 cubic yards of material to be paid at a price of 64 cents per cubic yard under Item 2. E & R allegedly agreed to the compromised estimated quantity of 100,000 cubic yards, believing the estimate to be too low, on condition that payment be based on cross-section measurements of the completed cofferdam and cross-dike.

The final contract was prepared in Oklahoma City by James and it was signed by E & R's representatives in Cincinnati, Ohio. Plaintiff maintains that there were two or three very substantial changes or additions in the written contract. The 100,000 cubic yards was allegedly for the first time broken down as follows:

"The estimated quantity for Item 2 of 100,000 cubic yards is based upon the following:

1. Earth cofferdam at elevation 480–16,000 cubic yards.

2. Earth cofferdam at elevation 456—8,000 cubic yards.

3. Material to be handled in building and removing connecting dike twice—38,000 cubic yards each move."

Plaintiff insists that the figures were arrived at in the following manner:

a) Ward was insisting on a *minimum* of 100,000 cubic yards in Item 2, having been negotiated down from his estimate of 279,000 cubic yards.

b) James knew that they would need at most 24,000 cubic yards hauled to the cofferdam system.

100,000 − 24,000 = 76,000 excess of estimate over intention

c) Reference had been made at the negotiations to a second cross-dike. If a second cross-dike were built, it would have to be hauled in and hauled out.

76,000 (excess estimate) $\div$ 2 = 38,000 cubic yards

d) The balance of the 100,000 cubic yard estimate promised Ward was therefore attributed to the second cross-dike which James had no intention of building. The "estimate" was made by dividing the excess of 76,000 by 2.

A more critical change, at least from Ward's concept of the negotiations, was that Item 2 was changed from a removal pay item to a construction pay item. The subcontract contained the following provision:

"Removal of earth cofferdams and dikes constructed under item 2, and final cleanup shall be paid for under item 6."

E & R had agreed to do both Item 2 and Item 6 for 64 cents per cubic yard. Plaintiff insists that it would seem as if it did not make any difference which pay item cofferdam removal was attributed to; however, by shifting cofferdam removal from Item 2 to Item 6, the double payment to cover several years of pumping, maintenance, etc., which E & R was counting on, disappeared.[10]

Although E & R's representatives argue that the above-quoted provisions of the subcontract constituted substantial changes from the parties' agreed bargain, E & R's William Ward signed and accepted the subcontract with all of its express terms, including the above.

After execution of the subcontract, E & R proceeded with performance of the subcontract work; and, shortly thereafter, a controversy developed between James and E & R involving the decision of James to omit construction of a cross-over dike, which the subcontract provided *"may be necessary to build"* (emphasis supplied) in order to perform contemplated excavation "in-the-dry." In compliance with requirement of the prime contract that all work in the lock excavation area should be protected by a 480 foot earth cofferdam or dike, James requested E & R to level off and finish a haul road across the area to be excavated, and along the 480' dike along the river, and extending upstream from the haul-road area. The downstream from that point surrounded the lower approach channel at an elevation of 456 feet. It later developed that the projected river elevation would permit completion of the lock excavation area, as well as the lower approach channel, without the river getting over the 456' dike. With approval of the Corps of Engineers, James proceeded to complete the work in the lock excavation area, and remove the cross-over dike, without constructing a second dike at 480 feet, when it became obvious that the water level would not exceed 456 feet.

■ The court holds that under the terms of the parties' contract, James was not required to allow E & R to build the cross-over dike twice, and therefore James did not guarantee or warrant payment for the estimated quantity of a second cross-over dike to E & R.

The work that was necessary to build the cofferdams was, for the most part, work other than actual movement of material to bring the cofferdam up to the required elevation. (See Exhibits 137 and 204.) Although the movement of material was only a part of the work incidental to the completion of the cofferdam, the court finds that this was the means adopted for calculating payment due E & R. By the express terms of the contract, E & R undertook the obligation of performing all of the "work necessary to build an earth cofferdam or dike."

10. E & R expected to receive double payment by being paid once under Item 2 and once under Item 6.

The subcontract states that under Item 2 the subcontractor ". . . will be paid on the basis of cross-section measurements of the completed cofferdams and dikes when they are installed as directed to the lines, grades and slopes established by the Contractor." Clearly this means, standing by itself, that payment shall be made on a cross-section basis to be taken after all the Item 2 work is completed. The quantity of material to be included in the cross-sections poses the issue in controversy on this item.

■■■■ The conduct and statements of parties, made at or before execution of the contract and surrounding circumstances, may all be considered in the interpretation of it. Corbin, Contracts, Vol. 3, § 543; Belcher v. Elliott, 312 F. 2d 245 (6th Cir. 1962).

The court finds that the parties were both sophisticated contractors. James did not mislead E & R by means of any misrepresentation or fraudulent inducement; instead, the court finds that the parties entered into hard bargaining which resulted in a final agreement as embodied in and expressed by the language of the subcontract. The court finds that E & R's William Ward had an opportunity to bargain and propose his offer to James' representatives and that E & R accepted responsibility for all of the work which was incidental to the building of a cofferdam. The court agrees with the conclusion of Elmer Gardner, an experienced contractor with the Corps of Engineers on lock and dam projects, who gave the following interpretation to the subcontract:

"I find a subcontractor in a precarious position with this one phrase. Therefore, this list [referring to the work which E & R allegedly performed incidental to moving material, Exhibit 137] is within the confines of his contractual obligations to do those many things and that is the excerpt right here, 'Include the work necessary to build an earth cofferdam.'

That is all-encompassing, a dangerous thing for a subcontractor to enter into." (Tr. 886)

E & R had the opportunity to accurately assess their anticipated expenses which would be reasonably incurred by placing an adequate per cubic yard price on the material which was estimated to be moved. Ward evidently believed that such protection was within the contract's terms with the estimated quantity of 100,000 cubic yards of material. E & R expected that there would be more material required to be added to the existing terrain in order to build the cofferdam to the satisfaction of the Corps, which originally specified 480' elevation for the downstream portion of the cofferdam system. The estimated quantity figures within the subcontract are evidence that the parties were looking toward and adopted added material as the standard for assessing the price for E & R's performance. The second cross-dike was not constructed and only 16,030 cubic yards of material was actually placed upon the existing terrain, an amount which is quite close to the originally estimated quantity for those respective parts of the cofferdam. Gardner testified that under the terms of the parties' contract, he "would not have been expecting to have been paid for the material I didn't put in place." (Tr. 883) The contract provides that the subcontractor "will be paid on the basis of cross-section measurements of the completed cofferdam and dikes when they are installed as directed." Gardner reasoned that "this embankment, this fixed part of it was not *installed* as directed." (Emphasis supplied.) (Tr. 882)

The court finds that the September 25, 1965 letter from William Ward to James (Exhibit F) reflects E & R's understanding of how it was to be paid for Item 2 work. The letter provides, in part:

"After an exhaustive study of the quantities moved and work left to be performed on subject contract, our

findings as to monies due at this time are as follows:

Item # 2 Lock Cofferdam
as per contract and agreement
$7,660.80

"We insist that you incorporate these values in your current estimate to the Corps of Engineers and payment be made to us as per terms of our contract."

Attached to this letter, Ward had enclosed a Status of Payment summary sheet which provided, in part:

"ITEM #2–Cofferdam

| Estimate Quantity | |
|---|---|
| 480 Cofferdam | 16,000CY |
| 456 Cofferdam | 8,000CY |
| | 24,000CY |
| Quantity Paid | 12,030CY |
| | 11,970CY" |

(Exhibit F)

---

Throughout the trial of this action and during the course of the parties' performance under the contract, plaintiff asserted that James did not make cross-section measurements available to E & R in order for them to assess their final payment.[11] (See Coll. Exhibit 215.) After reviewing Exhibits I and S, the court finds that this assertion by E & R that James failed to provide the cross-section measurements required by the subcontract is without merit.

The court holds that plaintiff failed to carry its burden of proof that the cross-section measurements of the completed cofferdams were to include natural earth, which was in place prior to E & R beginning its subcontract work. Therefore, the court finds that there was a meeting of the minds and no mutual mistake of fact or ambiguity in understanding existed between the parties as to the method of payment provided in the subcontract.

The question remaining under this item is whether plaintiff is entitled to recover in *quantum meruit* for any extra work which it allegedly performed, either due to the insistence of James or due to errors and interference by James' personnel.

The scope of Item 2 work was not clearly defined in the subcontract, but it was clearly defined in the prime contract specifications (Exhibit 2, pp. 2–6).

The value of the work performed under Item 2 by E & R at the completion of the job was estimated to have been $193,023. This estimate was based on the amount which E & R's work under Item 2 would have cost a well-equipped contractor. The total also reflects some work performed by E & R under its Item 2 which properly falls under Item 3, and does not include the value of that portion of the work performed by James.

The breakdown of the cofferdam-related work which E & R performed is as follows:

11. During the course of E & R's performance of placing material in the cofferdam and cross-dike, it was paid for the amount of material added (under Item 2) and removed (under Item 6). The final cross-sections would provide the final check for E & R to correct any errors in estimates of material previously paid for by James.

I. CLEANUP OF EXISTING CELLULAR COFFER-
DAM
1. Cleanup semi-liquid material $ 16,158.00
2. Cleanup of eroded material –0–

II. COFFERDAM UNWATERING AND DEWATER-
ING
1. Install pumps, piping, supports, light plan, etc.
 *includes transp., etc. (mobilization) 26,429.00
2. Pumping 57,067.00
 6″ diesel
 10″ diesel
 3″ gasoline

III. COFFERDAM BUILDING
1. Stripping 4,813.00
2. Replacement of stripped material 5,986.00
3. Compaction of replacement material 703.00
4. Cofferdam construction hauling 7,713.00
5. Embankment compaction 1,057.00
6. Harrowing and grading of existing material 388.00
7. Compacting of existing material 301.00
8. Sloping of river side of river cofferdam 2,083.00
9. Sloping of land side of river cofferdam 7,604.00
10. Resloping of land side slopes of the river
 cofferdam due to design and staking errors
 or changes by James 19,000.00
11. Grading final slope on cross dike 1,449.00
12. Excavation of ditch at back side of project
 area to intercept runoff to minimize pumping 2,804.00

IV. COFFERDAM REPAIR AND EROSION MAIN-
TENANCE
1. Removal of surface cracks 1,359.00
2. Slope grading 10,773.00
3. Removal of eroded material from bottom of ex-
 cavation 8,534.00
4. Repair of slide areas (one) 1,359.00
5. Maintenance of ditch at back side of project
 area 649.00

V. COFFERDAM RESHAPING DURING LIMITED
REMOVAL PHASE
1. Resloping land side of river cofferdam at point
 of cross dike 674.00
2. Resloping during peripheral dredging 1,103.00

VI. MISCELLANEOUS
1. Breaching 517.00
2. Removal of ramps on cofferdam 4,760.00

 Sub Total $183,283.00
 Indirect Cost 9,740.00

 TOTAL $193,023.00
 (Exhibit 204)

The court finds that the amounts cited above adequately and fairly reflect the value of the work performed by E & R under Item 2. Under *quantum meruit*, in computing damages, plaintiff is not limited to the unit prices or estimated quantities contained in the contract, but is entitled to be compensated on the basis of cost and expenditures actually made. Scaduto v. Orlando, *supra*, 381 F.2d at 595, 596; Corbin, Contracts, Vol. 5, § 1113. In fixing damages under *quantum meruit*, the test is what the cost would have been to obtain the same goods and services from another subcontractor in plaintiff's position. *See* United States v. Behan, *supra*; United States for Use of Susi Contracting Co. v. Zara Contracting Co., *supra*; Restatement of Contracts, § 347, comment c.

The question is: What jobs performed by E & R were not incidental to the building of a lock cofferdam?

Green testified that under Item 2, E & R had been retained to do 100,000 cubic yards of earth and perform a certain amount of pumping, i. e., the subcontractor shall perform his own pumping and control the water during his portion of the work. (Tr. 669) According to Green, approximately $5,000 to $6,000 of the $230,000 bid was involved in the placing of this dirt—16,000 cubic yards in the upstream cofferdam and 8,000 cubic yards in the downstream cofferdam. "The rest of the bid covered areas of purchasing sheet piling, driving sheet piling, pulling sheet piling, pumping, erosion clean up, sand bagging, bank stabilization, toe to slope bank stabilization I'm referring to. Items of this nature necessary in order to sand bag these toes." (Tr. 672–73)

The fact that James received $230,000 from the government in a lump sum payment for Item 2, which was bid as a unit price by E & R, is not relevant to the issue presented under this claim for recovery. There is no authority for the proposition that a subcontractor is entitled to claim the amount paid by the owner to the prime contractor as a basis for compensation for the subcontract work. The court will take judicial notice of the fact that contractors, in submitting a bid to the owner, may "unbalance" certain items of work in order to cover contingencies and to cover lower bid items in other parts of a total bid.

E & R is not entitled to receive any compensation for work which it performed as a necessity incidental to building the cofferdam because it accepted the method of payment for such work by use of cross-section measurements in the subcontract. E & R contends that it performed all of the work under Item 2 of the prime contract, except the field engineering and a portion of the pumping which was done by James. Additionally, plaintiff asserts that it performed a substantial portion of James' work under Item 3, which was not an item included within E & R's bid but which was performed out of necessity in order to perform E & R's Item 2 work.

With regard to payment under this item, the specifications read as follows:

"SECTION 2—COFFERDAM—EXTENSION, MAINTENANCE AND REMOVAL

\* \* \* \* \* \*

"2–06. PAYMENT.

"(a) *Lock Cofferdam.*—Payment for construction, maintenance and removal of the lock cofferdam will be made at the contract lump sum price for item No. 2, 'Lock Cofferdam', which price and payment shall constitute full compensation for furnishing all materials, equipment and labor and performing all work required to construct, satisfactorily maintain the cofferdam in an unwatered condition and removal upon completion and acceptance of the work within the cofferdam. Partial payments will be made for this work

based upon the following percentages of the contract lump sum price:

PERCENTAGE.

50% Completion and Unwatering of Cofferdam

50% Removal of Cofferdam

"(b) *Existing Cofferdam for the Dam.*—Payment for maintenance of the existing cofferdam will be made at the contract lump sum price for item No. 3, 'Maintenance of Existing Cofferdam' which price will constitute full compensation for furnishing all materials, equipment and labor necessary to unwater, clean up permanent work area and satisfactorily maintain the cofferdam in an unwatered condition and the removal of cutoff walls at the upstream and downstream arms of the cofferdam. The lump sum contract price will be prorated over the length of the contract and partial payments made monthly."

 After carefully reviewing all of the evidence the court finds that plaintiff is entitled to recover for several of the jobs which it performed that were not incidental to the building of a cofferdam and that were required to be done due to the insistence or inaction of James. Where a party is aware that extra work is being done without proper authorization but stands by without protest while extra work is being incorporated into the project, there is an implied promise that he will pay for the extra work. *See* United States v. Klefstad Engineering Co., 324 F.Supp. 972 (W.D.Pa.1971). In *Klefstad*, the prime contractor was given the right to recover for work it performed which was the responsibility of the subcontractor; whereas in the present case the subcontractor, E & R, is entitled to recover for work it performed which was the responsibility of the prime contractor, James. Whether the theory of recovery is considered as quasi-contract, implied-in-fact contract, or promissory estoppel, a subcontractor is entitled to be compensated for extra work it performed as the result of inducing statements and conduct by the prime contractor. Continental Casualty Co. v. Schaefer, 173 F.2d 5 (9th Cir. 1949).

After reviewing all of the evidence, the court finds the following:

1. E & R is entitled to $16,158 for its work in cleaning up the existing cellular cofferdam. The court finds that this work was clearly an obligation which was part of James' work under bid Item 3 and that E & R was not under any obligation to perform the same. (See Spec. 2–06(b) cited above.) The court finds that E & R dewatered the pre-existing excavation and subsequently cleaned out the interior surface within the existing cellular cofferdam at the insistence of James and in order to perform its work under Item 2.

2. The court finds that E & R did prove that it did extra pumping which was not required by the terms of the subcontract. The subcontract contained a provision that the subcontractor "shall perform his own pumping and control of water during his portion of the work." The pumping responsibility was specifically referred to in the subcontract, but no separate pay item was set up for it. Under the prime contract, the cost of pumping was to be included as part of the bid for the item with which it was related, general dewatering being divided between Items 2 and 3, and the specialized watering and dewatering operations relating to the concrete work were included in with the various concrete items. The evidence clearly shows that E & R performed some Item 3 pumping which was the responsibility of James (Tr. 908, 1219–1228). The court is without any evidence showing the amount of Item 3 pumping which E & R performed. No assessment can be accurately made because the pumping for the project was submitted by a lump sum bid, and E & R failed to prove what portion of the pumping it performed was not part of its contractual obligations. Plaintiff claims it performed in excess of $50,000 in value of pumping services. By applying the rule that where the fact of damages is certain, the uncertainty of

the amount will not prevent their being assessed, the court holds that plaintiff is entitled to recover Five Thousand Dollars ($5,000.00) for the value of its pumping services which it performed in excess of its contractual requirements. *See* Matarese v. Moore-McCormack Lines, 158 F.2d 631, 637 (2nd Cir. 1946); Coverdell v. Mid-South Farm Equipment Association, 335 F.2d 9 (6th Cir. 1964).

3. The court finds that E & R is entitled to recover $19,000 under III–10, $674 under V–1, and $1,103 under V–2 of the breakdown of the work which E & R performed on the cofferdam, Exhibit 204 cited hereinabove. Plaintiff is entitled to these amounts due to the design and staking errors of James. (See Exhibits 144–50, H, I). After E & R had constructed the cofferdam in accordance with the design and stakes of James, it was required to reslope these three areas of earth. By referring to Exhibits 135 and 138 the court finds that the cofferdam had to be cut back several feet along its entire length, and had to be reshaped in order to clear the flume construction area. Reshaping and resloping also became necessary when the 480 downstream dike was lowered to elevation 460. See also Exhibits 147, 148, 149, 152, 157, 158, 159, 166, and 218.

4. As to IV, Cofferdam Repair and Erosion Maintenance, the evidence is clear that the contract made no provision for the continuing performance by E & R to maintain the cofferdam once accepted by James. Usually, maintenance and repair of cofferdams is specifically covered in the contract. (Tr. 867). E & R maintains that although cofferdam maintenance and repair were not part of the contract negotiations, E & R performed the work necessary at the direction of James. By construing the terms of the subcontract, E & R would be responsible for such work until the cofferdam was completed when they are "installed as directed to the lines, grades and slopes established by CONTRACTOR." E. Ward testified that E & R's efforts took place after the cofferdams

had been completed and approved by James. (Tr. 222). Defendant offered no evidence in rebuttal that it had not in fact accepted the cofferdams and the work performed by E & R under IV was subsequent thereto; accordingly, the court holds that James is liable to E & R for the total amount of work performed by E & R for Cofferdam Repair and Erosion Maintenance, which amount is $22,674.

Accordingly, the court holds that E & R is entitled to recover Sixty-Four Thousand Six Hundred Nine Dollars ($64,609.00) for the work which it was required by James to perform either due to errors by James' personnel or due to necessity in order to allow E & R to complete its Item 2 work.

### Item (c). ARBITRARY DREDGE LIMITS

Plaintiff claims that it was damaged by defendant James' stopping of plaintiff's dredge at Station 12 + 50b in the Stage II area. When the progress of excavation in Stage I became seriously retarded due to the inability of rubber-tired vehicles to operate efficiently in the wet conditions which were encountered, E & R proposed a dredging operation in Stage II which would have the effect of expediting Stage I excavation. This would be accomplished as a consequence of enabling crawler pans from Stage I to dump dirt to the dredge in Stage II, thus reducing the distance of the crawler pan hauls.

James agreed to submit E & R's proposal to the Corps:

Enclosed herewith are four (4) copies of drawing CH–2, Stage I, Dredge Pit. This drawing shows the proposed limit for the dredging operation in moving the dredge from the river up through the downstream channel excavation area to a position where it can pick up material hauled out of Stage I Cofferdam.

At this time, it is apparent that the presently used rubber tired scrapers cannot function in the excavation of

Stage I Cofferdam. We propose to use scrapers pulled by crawler tractors to complete this excavation. The dredge will be necessary to transport spoil from these crawler units to the designated spoil areas.

Since removal of a substantial portion of Stage II excavation will be necessary to carry out this procedure, a shortage of impervious material from common excavation will occur. Such impervious material as may be required will be obtained from such source as is permissible within the designated contractors work area at no additional cost to the Government.

The original lines submitted to the Corps as depicted on CH–2 (Exhibit K) went right up to the foot of the crossover dike; no upstream limit for dredging is depicted.

F. P. Gaines of the Corps responded to James' proposal with the following letter:

Reference is made to your letter of 18 January 1965 proposing a dredge operation to facilitate removal of the remaining Stage I and a substantial portion of the Stage II excavation.

This office has no objection to a dredge operation in the downstream lock approach (Stage II excavation) provided necessary precautions, to prevent damage to permanent slopes, are taken. The limits of your dredge pit should be a sufficient distance from permanent slopes so that any slides occurring as a result of your dredging operation will not encroach upon the *proposed permanent slope*. In view of the character of the materials existing in this area as shown on the contract drawing, the distances shown on your Drawing CH–2 are not considered adequate to assure this protection.

Only a channel of minimum width and depth, necessary for access from the river to the dredge pit, should be accomplished during this high water period. Final excavation of the permanent lock approach slope and the placement of riprap thereon shall be accomplished in the dry as specified.

Should a movement or slide of material occur in areas of permanent work which in the opinion of the contracting officer was caused by the dredging operation, the contractor will repair the affected area at no expense to the Government.

With respect to the last paragraph of your letter, it is considered that paragraph 4–04(a) of the specifications adequately covers the borrow requirements, in the event the contractor does not utilize required excavation for construction of impervious and random fills.

George Green of James sent the Corps letter to E & R with the following cover letter:

The enclosed letter from the Corps of Engineers dated January 27, 1965 is your approval to proceed with your proposed use of a dredge to handle material from Stage I cofferdam excavation. Please take special note of the responsibilities and limitations set forth in the letter referred to. Since this method of handling material is not in accordance with the original plans as outlined in the contract between yourself and the undersigned, those responsibilities as set forth in the letter will rest on you.

Please note your acknowledgement of the aforementioned and enclosed in the space provided below and return the original of this letter to this office.

James made the special arrangement with the Corps of Engineers to permit plaintiff to bring its dredge into the Stage II area, within the 456′ dike in order to expedite plaintiff's excavation work, which had fallen behind. This entry was made before plaintiff had stabilized the embankment, in accordance with plans and specifications, which was

a condition precedent to dredge operations.[12]

During the second phase of the common excavation, in Stage II of the project, forward dredge limits for E & R's dredge were set at Station 12 + 50b, a location approximately 140 feet from a point which would represent the toe of a cross-dike which would have been 20 feet wide on top with 2 to 1 slopes, i. e., the same size as the cofferdam between the Stage I excavation and the Cumberland River, and the size shown on James' first drawing, 2–0043–1, dated July 2, 1964 (Exhibit 135). These stakes were set prior to the arrival on the job of Lester Marcum, who relieved Leo Wilsbacher as the Corps of Engineers' resident engineer on the job.

Plaintiff contends that the dredge could safely have proceeded to Station 11 + 10b which would have permitted E & R to dredge an additional 81,724 cubic yards of earth. As a consequence of the dredge limitation set, E & R was required to remove the above-cited amount of earth by use of a more expensive means. Because of the job being required to be finished by means other than the use of a dredge, a job which would have been completed in approximately 16 days took several months instead. Plaintiff asserts that its costs were increased by James' alleged unreasonable interference by the amount of $40,862.

The court finds that in light of the language of the January 27, 1965 letter from the Corps of Engineers, E & R had notice that it was being allowed to use its dredge in Stage II in order to remove Stage I material under uncertain limitations which would be subsequently established and would be more strict than those sought by James in its January 18, 1965, proposal. (Exhibit L–1). On January 28, 1965, E & R's William Ward expressly accepted these undefined restrictions and limitations which were to be subsequently established.

Plaintiff insists that no one from the Corps of Engineers made the decision to stop the dredge at Station 12 + 50b. Although the record does not reflect what individual with the Corps actually set the Station forward dredge limitation, the court does find that the Corps did impose a forward limitation upon dredging in Stage II. When Lester Marcum arrived at the job, the forward limitation stake had already been set. The Corps had a copy of drawing CH–2 on which a "97 foot limit from the toe of the riprap, or final slope as finished" had been inserted. According to Marcum, "[t]he line was drawn up to the cross-over dike, or near it, and perpendicular across to the river. These are the limits in which we could work." (Tr. 1237). "The design people reviewed our conditions out there, and to prevent sliding or breaking back into the permanent slope, which we were trying to pro-

12. The specifications provided under Para. 3–04, HYDRAULIC EXCAVATION, as follows:

"(a) General.—Removal of materials, except required usable impervious or random fill materials and as otherwise specified, in lower approach to the lock and downstream of spillway section of the dam may be removed by hydraulic dredging provided all finished slopes of spoil areas and finished excavations are constructed to the lines and grades shown and other requirements listed below are complied with.
* * * * *
"(c) Drainage.—A detailed plan of proposed drainage system shall be submitted to the contracting officer for approval prior to beginning of any hydraulic dredging work. No drainage water will be permitted to pass over the embankment. Finished slopes in downstream approach to the lock shall be excavated well in advance of dredging operations to rock or toe of slope by dragline or other approved equipment to prevent possible slides from undercutting at the finished slopes shown. Should slides occur in any of the areas affected by hydraulic dredging, the contractor shall remove and replace the affected areas at no additional costs to the Government.

"(d) Disposal.—All hydraulic dredge material shall be disposed of in confined areas, that is by bulkhead or embankments. Waste weirs shall be furnished and maintained at no additional cost to the Government."

tect, they established this as the safe distance." (Tr. 1237–38). The 97-foot line extended "from the toe of the rip-rap as finally developed . . . out into the existing Stage II." (Tr. 1239). "The cofferdam . . . had been given the same respectful safe distance as the slope had. . . . There was no dimension provided up here [referring to the area of the cofferdam] but drawn about the same scale." (Tr. 1239–40). "The limit lines were drawn constant throughout and the dimensions only appeared in one place, . . . so I naturally assumed this would hold true throughout unless some other dimension was provided somewhere else." (Tr. 1240). "We stopped in the general vicinity of that 97 feet, but it was not an essential enough matter to take a precise measurement. At this particular time it was just an intermediate phase. I doubt if any measurements were made to the exact . . . ." (Tr. 1242). The 97-foot limit was set because, "[t]his was the distance on the slope of the earth that they figured the conditions would tolerate without a circular slide going back into the material we were trying to protect." (Tr. 1242).

Green testified, "We [referring to James] set the stakes. The location of the stakes was a result of me going back to the Corps of Engineers and saying, 'Fellows, you say that my lines that we have submitted are unacceptable. What is acceptable?' Consequently, as a result of discussions and negotiations, they established limits." (Tr. 743).

The court finds that this testimony evidences that the decision to establish the forward dredging limitation at Station 12 + 50b was a joint decision between Corps personnel and representatives of James.

Defendant maintains that a "solution channel" that existed near the cross-dike made it dangerous to proceed any further than Station 12 + 50b, and that to do so might have resulted in a cave-in of the cross-dike or flooding of Stage I. Plaintiff maintains that it was not until trial that the information was volunteered by defendant's witnesses George

Green and Lester Marcum of the Corps that the reason for stopping the dredge was the potential danger which was threatened by the presence of a solution channel. However, plaintiff's main witness, E. Ward, testified that he was told by Green that the reason the dredge was stopped was "that there was an old solution channel there, or the night shift or day shift might run through a dike." (Tr. 327).

After reviewing all of the testimony, the court finds that the solution channel did pose a potential threat to the integrity of the job site. (See Tr. 1264). Therefore, the court finds that defendant and the Corps had a substantial reason for limiting E & R's dredging operation.

Exhibit W is a drawing of the cross-over dike at elevation 480'. The contour lines are taken off of the original contract drawing, Q16–10/13 (Exhibit 3). These contour lines reflect the existence of a solution channel. (Tr. 740). Plaintiff insists that if it really did exist as a hazard, the fact should have been made known to plaintiff before it signed the subcontract, and before it decided on the dredge operation, and invested substantial money in the purchase of the dredge. If the existence of the channel was known to James, or should have been known to James, at the time the E & R contract was executed, James had a duty to make its existence known, so as to enable E & R to compile a suitable contract price. The court finds that its existence was known, and that E & R had an adequate opportunity to apprise itself of its existence. In light of the fact that the solution channel was depicted on the drawing which E & R had access to prior to bidding the job, the court does not find that it constituted an unknown subsurface condition which would fall within the language or meaning of Article 4 of the prime contract. Accordingly, the court does not find that the facts of the present case fall within the scope of the holdings by the United States Supreme Court and the Sixth Circuit Court of Appeals which did find such "unknown" subsur-

face conditions to exist. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Christie v. United States, 237 U.S. 234, 35 S.Ct. 565, 59 L. Ed. 933 (1915); Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L. Ed. 898 (1914); United States v. Ross Corporation, *supra*.

With the evidence clearly establishing that the dredge was stopped by the Corps of Engineers and James to provide security against possible cave-in or threatened damage to the integrity of the Stage I area because of the existence of a "solution channel," and with no expert evidence offered by plaintiff that the stopping place was actually unreasonable, the court holds that plaintiff failed to carry its burden of proof. The only evidence offered by plaintiff in support of this item was that the dredge was stopped, and that it would have been cheaper to excavate the material by dredge rather than by use of drag-line and dump trucks.

Defendant's stopping of the dredge did not violate a condition of the subcontract, either expressed or implied. Paragraph (5) of the subcontract provided that plaintiff should "perform upon request by contractor." Plaintiff offered no expert evidence that would establish the stopping point for the dredge to have been improper, or a breach of contract. James was responsible for the protection of the total worksite, and the court finds that even if James made the decision independent of Corps collaboration to stop E & R's dredge at Station 12 + 50b, it had the prerogative to do so in light of all the facts and circumstances.

Plaintiff's permission to enter Stage II prematurely to the terms of the specifications was under notice that acceptable limitations would be forthcoming. The purpose for E & R's premature presence in the Stage II area was the removal of Stage I material. E & R did not present any proof that the forward dredging limitation imposed upon it hindered its ability to deliver Stage I material to the dredge in the Stage II dredge pit as it existed when it was stopped from any further forward movement with the dredge.

During the trial plaintiff's counsel inferred that James could have relocated the cross-dike in order to avoid the solution channel, but the court finds that plaintiff failed to prove that this was a viable alternative. (See Tr. 1264–68.)

Plaintiff's proof failed to establish either breach of any contractual obligation by James or any unwarranted interference with E & R's performance. Accordingly, the court holds that plaintiff is not entitled to any recovery for this claim.

### Item (d). FILTER MATERIAL

When E & R submitted its bid to James on providing filter material under Item 15 of the contract, the specifications for both filter and for bedding material (Item 22) indicated that both of them would be obtainable from natural sand and gravel deposits near the site of the project. Later in the course of the project, the Corps of Engineers desired to change the specifications for bedding material, and did so, such that only quarry-produced material would meet the new specifications.

The Corps of Engineers asked James to submit a new bid for the bedding material, and James in turn asked E & R to submit a new bid to it. On May 1, 1965, E & R submitted a new bid to James of $6.28 per unit, or $1.00 more per unit than the original bid for natural sand gravel.

James submitted E & R's bid to the Corps, adopting it as its own, but the Corps thought the bid was too high and suggested a conference to resolve the issue. James related this information to E & R and asked E & R to reconsider. E & R was anxious to obtain both filter and bedding material from the same source, whatever that source might be, so that certain economies could be realized by either a volume quarry operation or a volume natural sand and gravel dredging operation. However, as the specifications now stood, filter material could only be natural sand and gravel

and bedding material could only be obtained from a quarry.

In its letter dated June 17, 1965, E & R made a new proposal to James in which it offered to supply *both* bedding and filter for a price of $5.98 per cubic yard on each item. Attached to the proposal was the Lambert Brothers Quarry quotation for both items, and a written condition: "The above prices are based on producer being allowed to use quarry fines in producing the above materials."

On September 23, 1965, E & R again sent a letter to James, requesting an answer to its June 17 proposal:

"In planning our riprap of slopes Phase I and II, I need the following information: In writing, approval from the Corps of Engineers on bedding and filter material." (Coll. Exhibit 172.)

On September 28, 1965, James wrote back in part as follows:

"The modification changing the gradation and the drawings relative to bedding material has been approved. You are hearby directed to proceed on the basis of your proposal dated May 1, 1965 and changes on June 17, 1965." (Coll. Exhibit 172.)

E & R construed James' answer of September 28, 1965 as being an acceptance of its proposal pertaining to both filter and bedding as submitted May 1 and June 17, 1965. However, at a later date it became apparent that the Corps would not change its specifications for the filter material and E & R was not allowed to use the filter material upon which it had predicated its package bid of June 17, 1965.

The correspondence between the parties establishes that there was a mutual mistake made by the parties while renegotiating the price of bedding material when the Corps altered the bedding specifications. E & R's second offer was a package offer pertaining to *both* filter and bedding, and it was accepted by James; however, no evidence was introduced which demonstrated that the Corps personnel even had knowledge of E & R's request to be allowed to change its original price quotation for filter material. James knew of the circumstances, i. e., that E & R was attempting to obtain a common source for both filter and bedding material in order to secure a better average price. James' acceptance and approval embodied in George Green's letter of September 28, 1965, understandably misled E & R into believing that approval of the $5.98 per cubic yard price and source of material had been obtained as to both filter and bedding material.

Defendant argues that this does not present a breach of contract on the part of James, but instead, it falls within the provision of Paragraph (6) of the subcontract, which precludes recovery by plaintiff from James of an "extra" claim, unless allowed and paid for by the government.

"6) CONTRACTOR shall not be liable for extras unless allowed and paid for by the OWNER; and CONTRACTOR may assign to SUBCONTRACTOR the right to recover for extras or claims from the OWNER, or claims against other subcontractors, and be relieved of all liability therefor to SUBCONTRACTOR."

Pursuant to Paragraph (6) of the subcontract, James sought from the government extra compensation for the additional cost incurred by plaintiff to acquire filter material from another source, but the claim was denied by the government. Pursuant to the provisions of Paragraph (6) of the subcontract, defendant has tendered to plaintiff any claim which might exist against the government by reason of such change in specifications, and James claims to be thereby relieved of further liability to plaintiff.

The court does not agree with the defendant's claim of relief from liability under Paragraph (6) of the parties' subcontract. No evidence was introduced that the Corps considered allowing a change in the originally-quoted price for filter material. James was the bargaining party with both the Corps and E & R. The court believes that equity requires that James be estopped

from asserting the exculpatory provision of the subcontract to avoid liability for E & R's increased expenses incurred for filter material because the evidence is clear that James' September 28, 1965, letter of approval of E & R's proposed quotations and sources for both filter and bedding material reasonably misled E & R into believing that the proposed change for filter material had also been accepted. If the court considers the price changes for bedding and filter material as extras, then the only extra which the Corps could be linked with would be the bedding material. James was the only party which approved and accepted E & R's offer of incurring an extra for filter material. Consequently, the tendered assignment of the claim for the alleged extra against the government incurred due to the increased cost of bedding material is without substance or value.

The court does not believe that James wrongfully or intentionally misled E & R, but finds that James' conduct caused a mutual mistake to arise and exist between the parties. The court finds that such mutual mistake and/or misrepresentation requires the application of *quantum meruit* to the item, which would entitle plaintiff to recover its actual additional costs.

In summary the court finds that as a consequence of change in requirements of the specifications for bedding material made by the government, after the job was in progress, James accepted E & R's proposal to meet the modified specifications by an increase in the price of both filter drainage material under Item 15 and bedding rock for riprap under Item 22 by 70 cents per cubic yard for each, provided, however, that both could be obtained from the same source. Thereafter, E & R's filter material was rejected by the government.

As a result of the Corps' refusal to accept the agreed filter material, E & R was compelled by James to acquire such from another source at a higher price, for which E & R was not compensated, thus increasing the value of the services rendered by an amount of not less than $23,514.16.

E & R's additional costs on this item were as follows: E & R was forced to purchase 1,316 cubic yards of filter from the only supplier found, Pat Eatherly, at a price of $7.00 per cubic yard. In addition, E & R had to rehandle the material from a stockpile on the site and lay it in the filter ditch itself, for an additional cost of $2.00 per cubic yard, resulting in a net cost of $9.00 per cubic yard. After the first 1,316 cubic yards had been delivered, Eatherly raised his price an additional 50 cents to $7.50 per cubic yard due to the poor condition of the job site access road, for a net total cost on the 4,412 cubic yard balance of material needed of $9.50 per cubic yard.

Calculations are as follows:

| | |
|---|---|
| 1,316 c.y. at $9.00 per c.y. .................... ($7.00 to Eatherly plus $2.00 for rehandling and laying in ditch) | $11,844.00 |
| 4,412 c.y. at $9.50 per c.y. .................... ($7.50 to Eatherly plus $2.00 for rehandling and laying in ditch) | 41,914.00 |
| Total cost to E & R (without profit) ................................... | $53,758.00 |
| Less amount received from James for 5,728 c.y. at $5.28 per c.y. ................................... | 30,243.84 |
| Loss to E & R on this item ................................... | $23,514.16 |

Accordingly, the court holds that E & R is entitled to recover the sum of Twenty-Three Thousand Five Hundred Fourteen Dollars and Sixteen Cents ($23,514.16) under this claim.

## Item (e). DESTRUCTION OF IMPERVIOUS FILL STOCKPILE

Early in the course of the project, plaintiff stockpiled impervious fill which it had removed from the upper elevations of the Stage II area. E & R placed this material in the area immediately up the hill from the Stage I excavation, in front of the point of construction of the short wall of the lock. Impervious fill was to be used in the backfill behind the short wall, after the short wall was constructed, and plaintiff placed the material along the slope in such a position as would enable them to bulldoze this material down the slope towards the completion of the project, without the necessity of loading it and hauling it in trucks. Two such deposits of impervious fill were spread behind the monuments in an area staked by James, one of which was approximately five to eight feet in depth and the other approximately ten feet in depth, both covering large areas. (See Exhibit 173.)

An estimated total of 22,231 cubic yards of impervious fill were deposited in these two stockpiles.

The stockpiles which E & R created were shallow layers over a broad area because E. Ward of E & R was advised by Leo Willsbacher of the Corps and George Green of James to keep the stockpiles back from the monuments and the slope. After attaining an average of seven feet, Ward was advised not to put any more material in this location because it was feared E & R would overload the slope. (Tr. 384).

Stockpiling of materials is generally at a location as close as one can get to the worksite without being in the spoil areas. E & R was depending on the stakes as set by James, the Corps of Engineers monuments, and the blue print layout for the access roads to protect the integrity of its impervious stockpile from subsequent contamination. These stockpiles were contaminated at a later stage in the course of the project by defendant James, which constructed a shot rock road across the entire length of one stockpile and dumped waste rock, being stored for later use as coarse rock fill, in the entire area of the second stockpile. As a consequence, none of the stockpiled impervious fill was usable for its intended purpose.

The evidence was sharply disputed between plaintiff and defendant James as to whether a stockpile of impervious material was actually established by plaintiff in the area alleged. The court finds that the plaintiff did have two stockpiles of topsoil material which E & R planned to use as impervious fill, but instead was subsequently rendered useless due to interference and conduct by James which contaminated the stockpiles.

Gilbert Meyer, a project engineer for James who was the person responsible for staking the operation, testified at first that E. Ward said that E & R did not require any stockpile areas early in the job. (Tr. 1174). However, Meyer later stated he did recall that E & R did stockpile topsoil downstream near the Stage II excavation. (Tr. 1178). Meyer went on to say, "I don't think we would have staked that [referring to the area where he recalled the location of a topsoil stockpile]. We would have just located an area out in there in general and said this is the place." (Tr. 1178–79). Finally Meyer stated that "[t]hey [E & R] put some material in them [referring to the colored areas of plaintiff's Exhibit 173 which were identified as the two impervious fill stockpile areas]." (Tr. 1183).

In light of the above-quoted testimony, the court finds that James did not require that the locations of stockpiles on the job site be formally staked out. Additionally, the court finds that James' representatives had knowledge of the existence of E & R's stockpiles.

Defendant maintains that approval of material by the Corps of Engineers is required before it can be stockpiled. E. Ward maintained that the material complied with Corps' specifications, but he conceded that it had not been approved by a Corps representative prior to stockpiling of it. The specifications provided the following:

"4–03. GENERAL PROVISIONS

\* \* \* \* \* \*

"(b) *Conduct of the Work.*

\* \* \* \* \* \*

"(3) *Stock Piling.*—When the excavation or the furnishing of rock or drain materials progresses at a faster rate than placement in the fill is being accomplished, or when the moisture content of the excavated material is above the allowable moisture content for compacted impervious fill, such material shall be stockpiled or spread and dried, as applicable, at approved locations until their use is authorized. No payment will be made for such stock piling and/or drying nor for the reloading and hauling of this material to its final position in the embankment.

"4–04. EMBANKMENT MATERIALS.

"(a) *General.*—The origin of any fill material in no way determines where it may be used in the embankment. It is intended to obtain both compacted impervious fill and random fill from required excavations. . . . Material to be wasted will be specifically designated by the contracting officer at the time the material is excavated. Materials containing brush, roots, sod or other perishable materials will not be considered suitable for any portion of the embankment. Suitability of the materials shall be subject to the approval of the contracting officer and their disposition in the embankment will be as directed by the contracting officer. . . ."

After reviewing all of the evidence, the testimony, and especially the above-cited contract specifications, the court finds that Corps approval was not required as a condition precedent for stockpiling of impervious fill on the job site, although Corps approval was required by the above-cited specifications before actual placement in the embankment and use as impervious fill. Stockpiling did not amount to Corps acceptance. The subcontractor who stockpiled the material which was proposed to be used as impervious fill had a continuing responsibility to keep the material free from contamination up until the time of final Corps approval, which was a condition precedent to the availability of use of the material for the anticipated purpose.

In summary the court finds plaintiff established two stockpiles on the worksite, and James, in breach of its contract obligations, destroyed the stockpiles. Plaintiff's only evidence that the alleged stockpiled material was in accordance with the specifications and of a quality which would have been approved by the Corps was in the testimony of E. Ward that indicated the procedure used to prepare the material for stockpiling and its original source. Plaintiff successfully carried its burden of proof as to the material stockpiled and the manner in which it was stockpiled. Defendant failed to convince the court with any evidence that the material would have been unacceptable for use as impervious fill.

The defendant had a duty to exercise care in its work (stockpiling coarse rock and laying rock-based roadways through the project) in such a manner as to not materially interfere with the work of the plaintiff (stockpiling impervious fill). For this careless interference with the plaintiff's performance under the subcontract, the plaintiff is entitled to recover in *quantum meruit* for the actual increased costs which it encountered. Because of the wrongful conduct by James which resulted in the contamination of E & R's

impervious fill stockpiles, E & R is entitled to be compensated for the added cost involved in the unanticipated handling and hauling of material necessitated by James' conduct. United States v. Ross Corporation, *supra*, 385 F.2d at 567. In reliance upon the authorities previously discussed in reference to the SHOT ROCK CLAIM [Item (a)], the court finds that plaintiff is entitled to recover its damages under this item. Plaintiff had agreed to perform the impervious fill item for 14 cents per cubic yard, in expectation in part that much of the fill could be stockpiled on the slope for subsequent use with a minimum of equipment and hauling. However, having lost the stockpiles, plaintiff was required to haul all of its impervious fill from borrow pits, at an estimated cost of 64 cents per cubic yard.

The loss to E & R for the destruction of its stockpiles can be computed by deducting the contract price of 14 cents from the actual cost, and multiplying the difference by the quantity stockpiled.

64 cents — 14 cents = 50 cents
50 cents × 22,231 c.y. = $11,115.50

Accordingly, the court holds that, under all of the facts and circumstances, plaintiff has successfully carried its burden of proof by a preponderance of the evidence to establish this claim. Therefore, plaintiff E & R is entitled to recover Eleven Thousand One Hundred Fifteen Dollars and Fifty Cents ($11,115.50) for the increased costs which it incurred under this item.

Item (f). DELAYS IN SUPPLYING COARSE ROCK FILL AND PERMISSION TO PROCEED WITH LOWERING 480 DIKE

By the terms of the subcontract agreement, James was obligated to supply E & R coarse rock fill. The existing supply was exhausted by May 5, 1966, thereby causing E & R's work crew to be idled. Plaintiff also maintains that James had represented to E & R that the lowering of the 480 dike to elevation 460 could be commenced as early as May 9, 1966; actual permission was withheld until June 8, 1966, thereby eliminating alternative work for said idled crews.

As a consequence of James' alleged unreasonable and unwarranted interference with the performance of E & R's contract by failure to supply coarse rock fill and failure to authorize the lowering of the 480 dike to elevation 460, simultaneously, the reasonable costs of performing this part of E & R's contract was increased by an amount not less than $3,818.49.

Coarse rock fill was rock material utilized behind the short wall. Under the subcontract in effect between James and E & R, James was to provide a stockpile of coarse rock fill on the project site, and E & R was responsible for putting the rock in its proper place behind the short wall.

By May 5, 1966, the stockpile of usable coarse rock fill was depleted, and E & R was not able to place any rock, despite the fact that they had men and machinery available to do so. At this particular stage of the construction, coarse rock fill and impervious fill were the only items available for E & R to work on to any appreciable degree. Impervious fill could only be laid a few hours per day because of the stringent moisture standard which the Corps of Engineers was enforcing with respect to that item.

James argued at the time of the shortage of fill that there was still some coarse rock fines left which, if mixed with some riprap, would meet the Corps of Engineers standards. E & R refused to take over the responsibility of mixing the rock unless James would furnish a loader for this operation, which James refused to do. E & R then offered the use of two of its Euclid dumps to go to the quarry to obtain the rock, at no extra cost to James, if in turn James would send two of its own trucks to the quarry for the same purpose. This operation began on May 18, 1966, and no

claim is asserted by E & R for any loss incurred after that date.

Exhibit QQ (Corps of Engineers' daily logs) indicates the following:

May 9, 1966—placed course rock fill from Sta. 1+00B to Sta. 1+50B.

May 10, 1966—placed coarse rock fill from Sta. 0+65B to 3+00B.

May 11, 1966—placed coarse rock fill from Sta. 0+65B to 1+00B.

May 12, 1966—No work after 11:00 a. m. due to rain.

May 13, 1966—No work due to rain and wet conditions.

May 14, 1966—No indication of any excavation and fill work.

May 16, 1966—No work due to rain.

May 17, 1966—placed coarse rock fill from Sta. 3+00B to 4+80B. No impervious or random fill due to wet conditions.

May 18, 1966—placed coarse rock fill from Sta. 0+75B to 3+00E. No impervious or random fill placed due to wet conditions.

May 19, 1966—placed coarse rock fill from Sta. 0+80B to 5+00B. No impervious or random fill due to wet conditions.

———◆———

Although the Corps' records show that some coarse rock fill work was performed on several of the days in question, the court finds that by calculating the amount of area upon which this work was performed on the respective days, that there is a substantial fluctuation of work actually performed.

| Date | Station to Station | Length of Area Filled * |
|------|--------------------|-----------------------|
| 5/9 | 1+00B – 1+50B | 50 feet |
| 5/10 | 0+65B – 3+00B | 235 feet |
| 5/11 | 0+65B – 1+00B | 35 feet |
| 5/12 | no coarse rock fill placement | |
| 5/13 | " " " " " | |
| 5/14 | " " " " " | |
| 5/16 | " " " " " | |
| 5/17 | 3+00B – 4+80B | 180 feet |
| 5/18 | 0+75B – 3+00B | 225 feet |
| 5/19 | 0+80B – 5+00B | 420 feet |

* The court assumes that the stations are 100 feet apart.

———◆———

Lester Marcum, resident engineer for the Corps, testified that coarse rock work was one of the few jobs that can be carried out in rain (Tr. 1277) so long as the haul roads were not so slick that the equipment could not operate.

Marcum was asked by the court whether coarse rock was exhausted in April and May, and he replied:

"From memory, we had some 8,000 to 10,000 yards stored for coarse rock purposes. This was partially used up. We were down to where it required some more work to reclaim the balance of it. It was exhausted only in that it was readily available without any processing for use. The normal procedure is to work from the top of your pile down. Your fine works down in the coarser material and it begins to get difficult to stay within gradation. It was exhausted in this

respect. The E & R company declined to dig any deeper into it, or process it any further. Then the question came up, do we continue working, and if I remember right maybe there was some material brought from the quarry to finish it out." (Tr. 1281–82) (Compare, Exhibit 220, which is a letter from Marcum to his superior indicating the exhaustion of coarse rock fill.)

E & R's proof established that the Corps was unwilling to accept the stockpiled coarse rock and that representatives of the Corps withheld approval from James, thereby causing delay and interruptions to E & R's ability to complete their responsibilities of placing the coarse rock material. James did not offer any evidence showing that E & R had any responsibility to process the partially contaminated stockpiled material. According to the terms of the parties' contract, James was solely responsible for supplying adequate coarse rock material.

Plaintiff maintains that an alternative job which E & R could have been working on during this period was lowering the 480 cofferdam to elevation 456. As early as November, 1965, E & R had been promised they could begin this operation by May 9, 1966, but actual permission was not received until June 8, 1966. It was undisputed that permission to lower the 480' dike before completion on Phase I was obtained by James from the Corps of Engineers, as an accommodation to plaintiff, and with an obligation that James assume responsibility for possible damage to work in progress in the Phase I area, if high water should overflow the lower elevation of the dike. The evidence reveals that James made a diligent and effective effort to secure this permission, and passed it on to plaintiff as early as reasonably possible.

After carefully reviewing all of the testimony and exhibits, especially Exhibits UU, VV, WW, YY, ZZ, AAA and BBB, the court finds that the portion of this claim which relies upon failure of James to give prompt permission to lower the 480 dike is without merit. The evidence clearly establishes that James sought permission to begin the lowering of the 480 dike on April 4, 1966. The other exhibits cited disclose the events and decisions which subsequently transpired and caused the withholding of permission by the Corps, which was given to E & R by James on June 8, 1966. The court adopts the conclusion of Green that the Corps evidently gave oral approval to proceed on June 7, 1966. (Tr. 803)

The court is somewhat limited in its ability to award damages under this item, having found that E & R is entitled to damages for James' delay in supplying coarse rock fill, while holding that E & R is not entitled to any damages for any alleged failure to grant prompt permission to proceed with lowering the 480 dike. Plaintiff submitted Exhibits 180 and 181 as evidence of the pieces of equipment and appropriate charges for such incurred as a loss due to the combined delays. Unfortunately, the court is without all of the necessary information to discern which equipment would have worked on which job. The court can determine the following.

During the period from May 5, 1966, to May 17, 1966, the plaintiff kept an account of its idle earthmoving machinery, and sent delay statements to the defendant at that time. The original delay notices, incorporated into the original complaint, were reviewed by the plaintiff prior to trial, and an overlap was discovered. A new schedule of idle machinery was prepared from the original time cards and delay forms in order to eliminate all duplicate charges and charges on equipment of questionable utility, which schedule was then used as a basis for drafting the amended complaint. That schedule as prepared still incorporated E & R's values as to the cost of the idle machinery, so prior to

trial a third schedule was prepared in which only fixed costs were reflected. All other machinery rates were left blank to be determined by an independent equipment value expert. Fixed charges occurred with some rented equipment which E & R had mobilized in anticipation of lowering the cofferdam. The lessor, Pat Eatherly, charged E & R for mobilization and demobilization on these pieces, which pieces were not used by E & R at this time due to the failure of James to grant the permission to lower the 480 cofferdam. E & R is not charging to James any more on leased equipment than E & R itself paid to Eatherly for bringing the machinery to the job site and subsequently removing it for lack of use.

Damages can be determined by utilizing Exhibit 180, and applying to it one-third (idle equipment rate) of the rates provided by expert Pletz, as follows. (No charges are made under this claim for employee wages; employees not utilized were laid off at the time.)

| Equipment | Rate per Shift | Stand-by Rate per Shift ($\frac{1}{3}$) |
|---|---|---|
| D–8 (46A) | 121.00 | |
| D–8 (36A) | 110.00 $= 115.50$ | $ 38.49 |
| HD–11P | 77.00 | 25.66 |
| 977 (53A) | 88.00 | |
| 977 (20A) | 77.00 $=$ 82.50 | 27.50 |
| Euclid Dump | 66.00 | 22.00 |
| Chevrolet Dump | 11.00 | 3.67 |
| Northwest | 121.00 | 40.32 |

First, relying upon the fact that plaintiff was not expecting to be able to begin lowering the 480 dike until May 9, 1966, the court believes that E & R is entitled to all of the losses which are shown for May 5 through May 7, because the equipment listed for these days must have necessarily been for use in placing coarse rock fill.

**May 5, 1966 Day**

| | |
|---|---|
| 1 DW–21 – 4 hrs. at $25/hr. | $100.00 |
| 1 D–8 | 38.49 |
| | $138.49 |

**May 5, 1966 Night**

| | |
|---|---|
| 2 Euclids | $ 44.00 |
| 2 977 Loaders | 55.00 |
| 1 Chevrolet Dump | 3.67 |
| 1 HD–11 Dozer | 25.66 |
| | $128.33 |

**May 6, 1966 Day**

| | |
|---|---|
| 1 DW–20 – 4 hrs. at $25/hr. | $100.00 |
| 1 D–8 Dozer | 38.49 |
| 1 977 Loader | 27.50 |
| 2 Euclids, ½ day | 22.00 |
| 1 977 Loader, ½ day | 13.75 |
| 1 HD–11 Dozer, ½ day | 12.83 |
| | $214.57 |

**May 6, 1966 Night**

| | |
|---|---|
| 1 Northwest | $ 40.32 |
| 2 Euclids | 44.00 |
| 2 977 Loaders | 55.00 |
| 1 Chevrolet Dump | 3.67 |
| 1 D–8 Dozer | 38.49 |
| | $181.48 |

| May 7, 1966 Day | | May 7, 1966 Night | |
|---|---|---|---|
| 1 D–8 Dozer | $ 38.49 | 1 Northwest | $ 40.32 |
| | | 2 Euclids | 44.00 |
| | | 1 977 Loader | 27.50 |
| | | 1 D–8 Dozer | 38.49 |
| | | 1 Chevrolet Dump | 3.67 |
| | | 1 HD–11 | 25.66 |
| | $ 38.49 | | $179.64 |

Summary:

| | | |
|---|---|---|
| May 5, 1966 – | $266.82 |
| May 6, 1966 – | 396.05 |
| May 7, 1966 – | 218.13 |
| Total loss: | $881.00 |
| (5/5/66 – 5/7/66) | |

---

Second, for the time period from May 9 through May 17, the court can rely upon E & R's statement:

"Beginning with the night shift of the 5th and ending with the night shift of the 16th, the two Euclids, the HD–11, and 1 977 could have been used for either common excavation or for hauling coarse rock fill, which was not available for hauling. Since these pieces could have been used for either dike lowering and removal or for coarse rock fill, but not for both at the same time, these items are only charged once." (Exhibit 181)

Therefore, due to the inability of the court to determine the proposed use of all the idle equipment listed on Exhibit 180 for these days, only the items which could have been used for either job will be shown as losses for which E & R may recover from May 9 through May 17, 1966.[13]

| May 9, 1966 Day | | May 9, 1966 Night | |
|---|---|---|---|
| 2 Euclid Dumps | $ 44.00 | 1 977 Loader | $ 27.50 |
| 1 977 Loader | 27.50 | 1 HD–11 Dozer | 25.66 |
| 1 HD–11 Dozer | 25.66 | 2 Euclids (½ night) | 22.00 |
| | $ 97.16 | | $ 75.16 |

| May 10, 1966 Day | | May 10, 1966 Night | |
|---|---|---|---|
| Rented Trucks | –0– | 1 977 Loader | $ 27.50 |
| | | 1 HD–11 Dozer | 25.66 |
| | | | $ 53.16 |

| May 11, 1966 Day | | May 11, 1966 Night | |
|---|---|---|---|
| Rented Trucks | –0– | 2 Euclids | $ 44.00 |
| | | 1 977 Loader | 27.50 |
| | | 1 HD–11 Dozer | 25.66 |
| | | | $ 97.16 |

---

13. See Exhibits 180, 181, and Proposed Finding of Fact, Conclusions of Law and Brief and Argument on Behalf of Plaintiff E & R Construction Co., filed March 13, 1972, pp. 36–38, for the complete schedule of idle machinery.

May 12, 1966 Day

| | |
|---|---|
| 2 Euclids (½ day) | $ 22.00 |
| 1 HD–11 Dozer (½ day) | 12.83 |
| 1 977 Loader (½ day) | 13.75 |
| | $ 48.58 |

May 12, 1966 Night

| | |
|---|---|
| 2 Euclids | $ 44.00 |
| 1 HD–11 Dozer | 25.66 |
| 1 977 Loader | 27.50 |
| | $ 97.16 |

May 13, 1966 Day

| | |
|---|---|
| 2 Euclids | $ 44.00 |
| 1 HD–11 Dozer | 25.66 |
| 1 977 Loader | 27.50 |
| | $ 97.16 |

May 13, 1966 Night

| | |
|---|---|
| 2 Euclids | $ 44.00 |
| 1 HD–11 Dozer | 25.66 |
| 1 977 Loader | 27.50 |
| | $ 97.16 |

May 14, 1966 Day

| | |
|---|---|
| 2 Euclids | $ 44.00 |
| 1 977 Loader | 27.50 |
| 1 HD–11 Dozer | 25.66 |
| | $ 97.16 |

May 14, 1966 Night

| | |
|---|---|
| 2 Euclids | $ 44.00 |
| 1 977 Loader | 27.50 |
| 1 HD–11 Dozer | 25.66 |
| | $ 97.16 |

May 16, 1966 Day

| | |
|---|---|
| 2 977 Loaders (entitled to ½) | $ 27.50 |
| 2 Euclids | 44.00 |
| 1 HD–11 Dozer | 25.66 |
| | $ 97.16 |

May 16, 1966 Night

| | |
|---|---|
| 2 977 Loaders (entitled to ½) | $ 27.50 |
| 2 Euclids | 44.00 |
| 1 HD–11 Dozer | 25.66 |
| | $ 97.16 |

May 17, 1966 Day

| | |
|---|---|
| 2 977 Loaders (entitled to ½) | $ 27.50 |
| | $ 27.50 |

May 17, 1966 Night

| | |
|---|---|
| 2 977 Loaders (entitled to ½) | $ 27.50 |
| 2 Euclids | 44.00 |
| | $ 71.50 |

Summary:

| | |
|---|---|
| May 9, 1966 – | $172.32 |
| May 10, 1966 – | 53.16 |
| May 11, 1966 – | 97.16 |
| May 12, 1966 – | 145.74 |
| May 13, 1966 – | 194.32 |
| May 14, 1966 – | 194.32 |
| May 16, 1966 – | 194.32 |
| May 17, 1966 – | 99.00 |
| Total loss: | $1,150.34 |

(5/9/66 – 5/17/66)

---

In light of the above findings of fact and the authorities previously cited under other claims which allow damages to be recovered for a breach of contract, the court holds that E & R is entitled to recover Two Thousand Thirty-One Dol-

lars and Thirty-Four Cents ($2,031.34) under this claim for the entire period of May 5 through May 17, 1966.

### Item (g). DREDGE DELAY

 By letter dated March 21, 1966, the defendant confirmed its previously submitted schedule for cofferdam removal which indicated that the 456 dike could be breached as early as June 22, 1966. (See also Exhibit 30.) Plaintiff's dredge returned to the site at the end of June and began excavating peripheral areas on July 11, 1966. Plaintiff advised the defendant James that as soon as they finished with the peripheral areas, they would be out of work for the dredge, at great economic expense to the plaintiff.

E & R alleged that the Corps of Engineers approved the work which was controlling the breach date as early as August 6, 1966, and did so formally on August 8, 1966. However, the proof showed that formal Corps approval to breach was not granted until August 10, 1966. (See Exhibit P.) The defendant directed the plaintiff to proceed with the breaching on August 11, 1966. (See Collective Exhibit 182—James' letter of August 11, 1966.)

On August 11, 1966, E & R, through E. Ward, acknowledged their authorization to breach. "This breach will start August 12, 1966 a. m. in order for you to finish your work and remove your equipment." (See Coll. Exhibit 182—E & R's letter of August 11, 1966.) See also, Green's testimony in regard to the kind of work which was required to be done before a breach was permitted. (Tr. 811)

After reviewing all of the evidence, the court finds that James extended to E & R permission to breach the 456 dike as soon as authorization was received from the Corps of Engineers on August 10, 1966. Plaintiff's proof fails to establish a breach of contract on the part of James in support of this claim.

### Item (h). SLOPE CLEANING AND REGRADING

In the performance of excavating the rock in Stage II of the project, James constructed a shot rock ramp, a portion of which was located on the 2 to 1 slope between Station 5 + 50b and 9 + 00b. Upon completion of its work in this area James only partially removed the shot rock ramp.

Due to James' failure to perform its duties in removal, it materially interfered with E & R's performance of its duties, thereby requiring E & R to complete the removal of the shot rock from the 2 to 1 slope.

On August 10, 11 and 12, 1966, the plaintiff expended a total of 28½ hours with a crew of four men and a Northwest dragline removing rock from the 2 to 1 riprap slope between Station 5 + 50b and 9 + 00b where James' shot rock access ramp had previously been located.

The cost of performing this work was estimated to have a total value of $1,720.02. (See Exhibit 183.)

Green testified that plaintiff's equipment also made use of the access road. (Tr. 816) However, E. Ward testified that E & R had completed its grade on the adjacent slope before the road was installed by James. (Tr. 424). The road lay across the slope that had been graded. (Tr. 424). Green testified that the slope was never finished "because the specifications required that the riprap and bedding material follow immediately after the finishing of these permanent slopes." (Tr. 818). Green admitted that James "built a ramp up through this area of an unfinished slope. I did the best job I could of taking the rock off of this slope, but he had work to do in there because he didn't have any bedding material at the time he wanted to finish this ramp." (Tr. 818).

After reviewing all of the evidence the court finds that James did interfere with E & R's ability to complete the grading and sloping of a riprap area in

Stage I due to shot rock which had been placed on an adjacent access road by James. In reliance upon the court's previous discussion under the shot rock claim in reference to a right of a subcontractor to recover in *quantum meruit* for a general contractor's interference with the subcontractor's performance, the court finds the defendant is liable to plaintiff for those damages incurred, i. e., its additional costs and expenses.

After reviewing Exhibit 183, the court finds that plaintiff is entitled to recover One Thousand Five Hundred Four Dollars and Seventy-Four Cents ($1,504.74). The court holds that plaintiff is not entitled to recover $215.28 of its original demand for $1,720.02 because that amount represented plaintiff's estimated profit and overhead.

### Item (i). FAILURE TO PROVIDE RIPRAP MATERIAL AND SET GUIDE STAKES FOR FILTER DITCH

Under the terms of the subcontract agreement James was obligated to provide riprap material for use by E & R in the performance of its contract and likewise was obligated to establish guide stakes for the filter ditch. Between August 15 and 17, 1966, E & R claims that no satisfactory riprap material was available and guide stakes had not been properly set.

On August 15, 16 and 17, 1966, the plaintiff had a crew composed of six men, one Northwest dragline and one 977 loader which sat idle for a period totaling 18 hours due to the failure of the defendant James to set discoverable filter ditch guide stakes. James' engineer, in lieu of stakes, used nails, which nails were impossible to locate even when James' engineer and his assistant joined in the search.

An alternative job for this crew during the same three days would have been to place riprap, but at this particular time the defendant's supply of riprap was exhausted.

Consequently the crew and machinery sat idle for a total of 18 hours over a three-day period waiting for the stakes to be reset or for riprap to arrive. On August 17, the defendant reset the filter ditch stakes, and productive work resumed.

The evidence showed that James had employees hauling riprap on all three of the days complained of by E & R. (See Exhibit LLL.) James also introduced pictures of riprap stockpiled at the lower end of the ramp. (Exhibit MMM) Plaintiff did not attempt to controvert or challenge this evidence, nor did plaintiff present evidence that the delivered riprap was an inadequate amount. Plaintiff failed to attribute a specific portion of the claim of $1,825.76 (see Exhibit 188) to improper staking. The defendant's representative failed to completely rebut the plaintiff's proof of improper staking, although Exhibits JJJ and KKK demonstrate that proper stakes were evidently placed because grading and excavating were taking place in the filter drainage trench on August 16 and 17.

The court holds that E & R failed to carry the burden of proof as to unavailability of riprap material, but did carry the burden of proof as to improper staking on the part of James' personnel on August 15, 1966. Therefore, the court will only award the damages incurred by E & R due to inadequate stakes.

After reviewing Exhibit 188, the court finds that the plaintiff is entitled to recover Two Hundred Thirty-Five Dollars and Twenty Cents ($235.20) under this item.

### Item (j). DELAY IN EXCAVATION OF FILTER DITCH DUE TO SHOT ROCK

James, in disposing of shot rock from its excavation, deposited it in the area which was to be excavated by E & R for a filter ditch.

As a consequence of James' material interference with the performance of this portion of E & R's contract, the value of the services rendered by E & R was increased by an amount of $2,312.08 (see Exhibits 195, 196).

On August 17, 18 and 19, 1966, the plaintiff's crew of men and equipment heretofore referred to under the previous claim, with the addition of one HD–11 dozer and one Autocar dump truck, expended 27 hours excavating the filter ditch through a compacted layer of shot rock which James had previously laid in the path of the filter ditch, which excavation would otherwise have been capable of being performed in approximately 19 hours under normal conditions, for a net loss of 8 hours. A similar loss of 2½ hours occurred on October 14, 1966. Four hours were expended on October 15, 1966, removing rock from the path of the filter ditch with a D–8 dozer and 977 loader. Six hours were expended on October 24, 1966, with a 977 loader and a D–8 dozer again removing rock from the path of the filter ditch and removing rock from previously excavated sections of the ditch which James had spilled into the ditch when it re-established its shot rock roadway. Finally, on October 26, 1966, one D–8 dozer and one 977 loader sat idle for an entire work shift because of the refusal of James to move its machinery out of the filter ditch work area. The net loss to E & R for this delay was as follows:

| | |
|---|---|
| August 17, 18, 19, 1966 | $ 891.30 |
| October 14, 1966 | 202.04 |
| October 15, 1966 | 256.56 |
| October 24, 1966 | 268.22 |
| October 26, 1966 | 693.96 |
| Total | $2,312.08 |

In a post-trial brief submitted by attorneys for defendants, counsel agrees with the court's comment upon trial that the court believed that the plaintiff had carried the burden of proof to permit recovery as to that part of the item involving labor and equipment expended by E & R in removal of rock from the filter ditch. However, as to that part of the claim involving idle D–8 dozer and 977 loader on October 26, 1966, defendant maintains that part of the claim is barred for failure of the plaintiff to comply with the notice requirements of Paragraph (7) of the subcontract.[14]

The court hereby finds that E & R is entitled to recover Two Thousand Three Hundred Twelve Dollars and Eight Cents ($2,312.08) under this claim.

## Item (k). DELAY IN IMPERVIOUS FILL AREA

This item was withdrawn by plaintiff at trial.

## Item (l). DISCREPANCY IN ITEM 6 CALCULATIONS

Plaintiff claims that under Item 6 of the subcontract, James failed to pay E & R for the removal of 892 cubic yards of common excavation at the rate of 64 cents per cubic yard, for a total of $570.88. In its post-trial brief, plaintiff has abandoned all of its claim under this item for extra on berm. Plaintiff still claims $102.40 for an alleged 160 cubic yards of extra material on dike which was removed by E & R without payment by James. Defendant's Exhibit X accurately reflects the payment made and E & R's contentions as to the payment due.

| E & R CLAIM | | GUY JAMES PAYMENT | |
|---|---|---|---|
| Corps final estimate | 1,522,464 c.y. | 1,522,464 c.y. | |
| Extra on dike | 16,030 c.y. | 15,870 c.y. | |
| Extra on berm | 3,132 c.y. | 2,442 c.y. | |
| Total excavation | 1,541,626 c.y. | 1,540,776 c.y. | |
| Less 75 % of amount excavated by James | −24,713 c.y. | −24,713 c.y. | |
| Total | 1,516,913 c.y. | 1,516,063 c.y. | |

14. See the section entitled "Notice of Delay Damages" at p. 1242 for the discussion of this point.

The only difference between the parties pertains to the proper amount for "extra on dike" and "extra on berm."

E & R believes that if they hauled 16,030 cubic yards to the cofferdam system under Item No. 2, which was stipulated to, they must have dredged 16,030 cubic yards away as a part of cofferdam removal, under Item No. 6 of the contract.

James' reply was:

"All right sir. That was a dike just upstream at station probably 1 plus 00–A. It was a dike in the interior portion of the cofferdam. E & R removed this dike, excuse me, I'm on the wrong side. That is the material that was put on the 480 and the 456 dike, the 16,030 is. The 15,870 is what we paid them for removing. The reason there is 160 yards that they didn't get paid for in moving is because as I have previously explained, we moved a portion of the upstream dike where they had previously put this 160 yards. We paid them for putting it on, we didn't pay them for taking it off because we took it off." (Tr. 748)

E & R did not attempt to controvert Green's assertion that the material was actually removed by James; instead, E & R relies upon the following analysis:

"Mr. Green had previously explained that in the area upstream of the cellular cofferdam, James excavated 32,950 cubic yards of the cofferdam, and as per agreement between the parties, agreed to credit to E & R 25% of that quantity, i. e., deduct only 75% of that quantity, or 24,713 cubic yards from E & R's final estimate of quantities under Item 6.

"If the 160 yards referred to by Mr. Green is a part of the 32,950 cubic yards excavated by James under that agreement, James has deducted that amount twice from E & R's final quantity. On the other hand, if it is not part of the 32,950 cubic yards, then it should have been added to that figure so that E & R would obtain the benefit of the 75%–25% agreement, as follows:

$$
\begin{array}{r}
32{,}950 \text{ c.y.} \\
160 \text{ c.y.} \\
\hline
33{,}110 \text{ c.y.} \\
\times .75 \\
\hline
24{,}832.50 \text{ c.y.}
\end{array}
$$

"Final computation then would be:

$$
\begin{array}{r}
1{,}533{,}464 \text{ c.y.} \\
16{,}030 \text{ c.y.} \\
2{,}442 \text{ c.y.} \\
\hline
1{,}540{,}936 \text{ c.y.} \\
-24{,}832 \text{ c.y.} \\
\hline
1{,}516{,}104 \text{ c.y.''}
\end{array}
$$

(Plaintiff's Post-trial Brief, p. 46, entitled Proposed Findings of Fact, Conclusions of Law, and Brief and Argument on Behalf of Plaintiff E & R Construction Co., which was filed on March 13, 1972.)

The court holds that plaintiff failed to controvert the evidence that James actually removed the 160 cubic yards of material on the berm. However, the court finds that the plaintiff's above-quoted analysis is accurate and therefore holds the defendant liable to plaintiff in the amount of Twenty-Six Dollars and Twenty-Four Cents ($26.24).[15]

### NOTICE OF DELAY DAMAGES

Defendant James has singled out certain of the claims to characterize them as delay-damage claims, and then argues that these claims as asserted by E & R are invalid due to lack of compliance with the written notice provision of

---

15.

1,516,104 c.y.—amount E & R was actually entitled to receive payment on based upon above-quoted computation

$$
\frac{1{,}516{,}063 \text{ c.y.—actually paid for by James}}{\text{(Ex. Q)}}
$$

41 c.y. at 64 cents each = $26.24

Paragraph 7 of the subcontract, which reads as follows:

"7) CONTRACTOR shall not be liable for claims for delay damage by SUBCONTRACTOR, unless written notice be given at time of the alleged delay, and written estimates thereof be furnished each week to CONTRACTOR; and shall, in no event, be liable for delays from conditions beyond control of CONTRACTOR."·

▇▇ A prime contractor has the right to protect himself against the type of delay damage claims made in the instant action by requiring the subcontractor to give written notice of the alleged delay at the time of commencement. A written notice requirement provided contractually by the parties is a condition precedent to recovery of delay damages under a construction contract, unless the parties have effectively waived compliance therewith or unless one of the parties who attempts to invoke the provision has practiced misleading conduct which requires estoppel. Corbin, Contracts, Vol. 3a, §§ 727, 756, 757, 759. See, e. g., authorities cited in 10 A.L.R.2d 801; Continental Casualty Co. v. Schaefer, 173 F.2d 5 (9th Cir. 1949); United States for Use of R. W. Vaught Co. v. F. D. Rich Co., Inc., 439 F.2d 895 (8th Cir. 1971).

Defendant would include as claims for delay damages: shot rock claim (a), failure to furnish coarse rock fill claim (f), failure to promptly authorize breach of 456 dike (g), failure to furnish adequate riprap (i), and delay in excavation of filter ditch (j).

After reviewing all of the evidence, the court finds that plaintiff did effectively comply with the written notice provision of the subcontract as to the several claims for delay damages asserted either in compliance with its terms or by conduct of defendant which constituted a waiver requiring estoppel.

▇▇ 1. Shot rock claim (a). The court finds that defendant James was notified of the down time of the dredge as it occurred in compliance with paragraph 7 of the subcontract. (Tr. 164). Additionally, the court finds that, because defendant made continuing promises to plaintiff that James would be responsible for and remove the shot rock which it had placed on the cofferdam and took steps to accomplish this, which conduct, in light of the facts, amounted to a material representation of fact, James effectively waived compliance with the written notice requirement due to its conduct. The court holds that James is estopped from invoking and relying upon this provision. Continental Casualty Co. v. Schaefer, *supra*.

▇▇ 2. Failure to provide coarse rock fill, claim (f). Exhibit 181 is a compilation of the down time and loss incurred by E & R relating to specific items of equipment as compiled from the original delay notices. (Tr. 385–392). E. Ward testified that E & R submitted timely invoices to James claiming delay damages due to the alleged losses incurred under the facts of this claim. In fact, the record reveals that E. Ward was reading from these invoices upon trial. Unfortunately, counsel for plaintiff neglected to formally tender the referred to invoices as an exhibit into the record (see Tr. 385, 386). Green denied having any recollection of receiving any such written notices of delay damage on this claim from the plaintiff (Tr. 796); however, Green did introduce Exhibit II which indicates that representatives of James were evidently surprised that E. Ward did not object to assertions of Marcum and James personnel at a meeting which involved a discussion of the availability of coarse rock fill during the period of time in question. After reviewing all of the evidence, the court finds that the defendant had sufficient notice of plaintiff's delay claim under this item and that justice demands that the inadvertence of counsel in having failed to formally tender the written invoices of delay damage claims in a lawsuit which had more than 300 exhibits filed during trial be overlooked.

3. Failure to promptly authorize breach of 456 dike, claim (g). Although

plaintiff complied with the written notice provision (see Collective Exhibit 182, letter of E & R dated August 12, 1966), the claim has been previously denied by the court in this opinion.

4. Lack of supply of riprap, claim (i). Plaintiff complied with paragraph 7 of the subcontract. See Collective Exhibit 188.

5. Delay in excavation of filter ditch, claim (j). Collective Exhibit 195 reflects delay losses incurred by E & R and demonstrates compliance with the written delay notice requirements of paragraph 7 of the subcontract.

In light of the above findings of fact, the court holds that James is not entitled to overcome any of the claims of E & R by asserting that E & R failed to comply with the written notice requirements of paragraph 7 of the subcontract.

## SURETY'S LIABILITY

The final question which the court must consider is whether the surety is liable for delay damages and property damages incurred by E & R due to the conduct of the prime contractor James, i. e., whether such damages fall within the meaning of labor and materials furnished "in prosecution of the work." 40 U.S.C. § 270b. See "Problems of Private Claimants Under Miller Act Payment Bonds," 9 William & Mary L.Rev. 1077 (1967); Burgess, "A Commentary on the Miller Act," 42 Bost.L.Rev. 282 (1962).

After reviewing a number of cases, the court finds that the following is an accurate and reasonable statement which summarizes the extent of the surety's liability for damages as sought in the present case.

"[A] subcontractor may not maintain an action against the surety on a Miller Act bond for the recovery of damages caused by the negligence of the prime contractor, the principal on such a bond, but [the subcontractor] does have a remedy against the surety for the recovery of the value of labor

and materials supplied by him in the prosecution of the work covered by such a bond, even though they were required by reason of the breach or default of said prime contractor . . ." United States for Use and Benefit of Moran Towing Corporation v. Hartford Accident & Indemnity Company, 204 F.Supp. 353, 356 (D.R. I.1962).

Damages based on misrepresentation and delays are not within the legislative intent of 40 U.S.C. §§ 270(a)– 270(d). United States for Use of Gutman v. P. J. Carlin Construction Company, 254 F.Supp. 1001 (E.D.N.Y.1965). A subcontractor is not entitled to recover from the surety for losses suffered due to delays growing out of the acts or omissions of others. United States to Use of Watsabaugh & Co. v. Seaboard Surety Co., 26 F.Supp. 681 (D.Mont. 1938), aff'd 106 F.2d 355 (9th Cir. 1939). The *Watsabaugh* case was decided under the Heard Act, which was the statutory predecessor to the Miller Act. *See also* Arthur N. Olive Co. v. United States, 297 F.2d 70, 72 (1st Cir. 1961), United States v. MacDonald Construction Co., 281 F.Supp. 1010 (E.D.Mo. 1968).

As reasoned by the Ninth Circuit Court of Appeals, "anything that is indispensable to the work contracted for falls within the meaning of the words 'labor and materials' as used in the Heard Act . . .." United States to Use of Watsabaugh & Co. v. Seaboard Surety Co., *supra*, 26 F.Supp. at 689. Recovery is allowed on the bond if the outlays for which recovery is sought were necessary for the performance of the contract and were within the contemplation of the parties to the contract.

"What was done was not required by any of the terms of the contract but became necessary because of an alleged breach of the contract because a contractor violated one of the terms of the contract; in other words, committed a wrong against the parties resulting in loss or damage to them." L.P. Friestedt Co. v. U. S. Fireproofing

Co., 125 F.2d 1010, 1012 (10th Cir. 1942).

The court does not find that the delay damages claimed by plaintiff present an analogous factual circumstance as was recognized by the Sixth Circuit Court of Appeals in a case in which the court allowed recovery for an unanticipated additional expense. United States for Use and Benefit of Carter v. Ross Corporation, 385 F.2d 564 (6th Cir. 1967).

"The courts have construed the Miller Act broadly to allow recovery against the contractor's surety bond for equipment actually used in the performance of the work. [Citations contained therein.] . . . [T]here is a distinction between claims for the value of materials furnished and damages for breach of contract. [Citations contained therein.]" United States for Use and Benefit of Wyatt & Kipper Engineers, Inc. v. Ramstad Construction Co., 194 F.Supp. 379, 381, 382 (D.Alaska 1961).

■■■ The subcontractor may recover against the prime contractor for work if it is requested to be done by the prime contractor and done in good faith, whether or not the prime contractor is ultimately compensated for it. *See* United States for Use and Benefit of Warren Painting Co. v. Boespflug Construction Co., 325 F.2d 54 (9th Cir. 1963); Macri & Sons v. United States for Use of Oaks Construction Co., 313 F.2d 119 (9th Cir. 1963); United States to Use of Viglione v. Klefstad Engineering Co., 324 F.Supp 972 (W.D.Pa.1971).

■■■ Where a general contractor on a government contract under the Miller Act, after breaching the terms of the subcontract, induces a subcontractor to perform extra work which the general contractor was originally obligated to perform, the value of labor and materials furnished and services performed for the general contractor at its special instance and request does not constitute damages for breach of contract, but constitutes "labor and materials" within the terms of the Miller Act, and within the payment bond so as to support recovery from the surety which sought to avoid liability on the ground that recovery was for damages for breach of subcontract by the general contractor. Continental Casualty Co. v. Schaefer, *supra*, 173 F. 2d at 9.

■■■ A subcontractor is entitled to recover from the surety of a government prime contractor amounts claimed as the result of excess excavations directed by the prime contractor. United States for Use and Benefit of R. J. Studer & Sons v. Aetna Casualty and Surety Company, 244 F.Supp. 162 (D.S.D.1965), aff'd in pertinent part, 365 F.2d 997 (8th Cir. 1966). In the *Studer* case the court found that the subcontractor performed work which was necessary to the job.

■■■ The fair rental value of equipment used on the project is covered by the Miller Act payment bond even though the equipment may be idle at times during the period of the lease. Friebel and Hartman, Inc. v. United States for Use of Codell Construction Co., 238 F.2d 394 (6th Cir. 1956), per curiam. Also, necessary expenses in placing rental equipment at the job site, e. g., freight and handling charges, are covered under payment bonds. Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206 (1917). The cost of furnishing repair parts to equipment under lease for use on the project is recoverable if it is not a capital expenditure. United States for Use and Benefit of Wyatt & Kipper Engineers, Inc. v. Ramstad Construction Co., *supra*.

■■■ Even though the subcontract was breached by defendant James, defendant surety, Federal, remains liable under the Miller Act for the fair value of the labor, materials and services furnished by plaintiff. Continental Casualty Co. v. Schaefer, *supra*; United States for Use and Benefit of Susi Contracting Co. v. Zara Contracting Co., *supra*;

United States v. Southern Construction Co., *supra.*

 It would appear that recovery against the surety under the Miller Act upon a *quantum meruit* claim would be limited to the value of labor, materials and services furnished by the subcontractor. Those items of plaintiff's claims which involve damages for stand-by time of equipment are not properly recoverable under the Miller Act against defendant surety, Federal. Of course, defendant James is liable to E & R for all of the claims for which the court has previously found liability in this opinion.

In accordance with the above, the court holds that defendant surety Federal is *not* liable to E & R for the following items:

1. Item (a), Shot Rock Damage;
2. Item (e), Destruction of Impervious Fill;
3. Item (f), Delay in Supplying Coarse Rock Fill;
4. Item (j), Delay in Excavation of Filter Ditch.

## INTEREST AND ATTORNEYS' FEES

 In a suit under the Miller Act, the right to interest is determined by the law of the state in which the work was performed. Golden West Construction Co. v. United States, 304 F.2d 753 (10th Cir. 1962); United States v. Continental Casualty Co., 303 F.2d 91 (4th Cir. 1962). In Tennessee, chancellors and juries are given an equitable power to allow interest in the form of damages, if they think it just. Mid-South Engineering Co. v. Buchanan, 59 Tenn.App. 289, 440 S.W.2d 600 (1967).

"The general rule is to allow interest in all cases where the amount of the debt is certain and not disputed on reasonable grounds. Textile Workers Union v. Brookside Mills, Inc., 205 Tenn. 394, 326 S.W.2d 671." Mid-South Engineering Co. v. Buchanan, *supra,* at 610.

Under the facts and circumstances of the present case, this court holds that plaintiff is not entitled to recover interest on any of the several claims because the amount of the damages which E & R is entitled to recover could not be determined until the completion of trial.

The court does not find that the facts of this case fall within the rule applied by the Sixth Circuit Court of Appeals:

"Where the amount for which recovery is sought, even though not liquidated, is based upon the readily ascertainable value of services or property, the general and better considered rule is to allow interest, at least in the absence of strong equities to the contrary." United States for Use and Benefit of Astro Cleaning & Packaging Corporation v. Jamison Company, *supra,* 425 F.2d at 1284, *quoting* Michelsen v. Penney, 135 F.2d 409, 435 (2nd Cir. 1943).

In view of the uncertainty as to the plaintiff's right to and the amount of damages, and recognizing the wide latitude afforded the court to award interest, the court finds that the allowance of interest on plaintiff's successful claims would be inequitable. Mid-South Engineering Co. v. Buchanan, *supra. See also* Tampa Electric Company v. Nashville Coal Company, *supra,* 214 F.Supp. at 658.

 The court also holds that in light of the facts and circumstances which surround this controversy, the plaintiff is likewise not entitled to recover attorneys' fees. See Hume, "What Law Determines Liability of a Miller Act Surety for Attorney's Fees?" 32 Ins.Col.J. 134 (1965).

The attorneys for the plaintiff shall prepare an order which shall incorporate all of the findings of this court as set out in its Memorandum Opinion. Said order shall be approved by the attorneys for the defendants and shall thereafter be submitted to this court, within twenty (20) days from the date of entry of this Memorandum Opinion, for final approval and filing with the clerk.

## APPENDIX

## SUB-CONTRACT

THIS SUB-CONTRACT, dated July 1, 1964, by and between the undersigned, "CONTRACTOR" and "SUB-CONTRACTOR," covers the agreement of the parties as follows:

Whereas, CONTRACTOR has a construction contract described as follows:

NAME OF OWNER: U. S. Army Corps of Engineers, Nashville District

DATE: June 26, 1964 NUMBER: DA–40–058–CIVENG–64–618

FOR CONSTRUCTION OF: Lock and Dam, Cordell Hull Project
Cumberland River, Tennessee

which contract, together with plans, specifications, work schedules, addenda and incidental instruments, are known to and understood by the undersigned parties; and made part hereof by reference.

For the consideration hereafter named, it is agreed:

1) SUB-CONTRACTOR shall furnish and pay for, all labor, material equipment and perform a part of the above construction contract as follows:

## SEE ATTACHED SHEETS

in accordance with CONTRACTOR'S obligations under the contract, etc., and to satisfaction of OWNER.

2) CONTRACTOR shall pay to SUB-CONTRACTOR unit prices according to schedule hereto attached in an estimated total sum of One Million, One Hundred Eighty-seven thousand, Two Hundred Sixty-six Dollars ($1,187,266.00), payable in monthly estimates, in such time and proportion as CONTRACTOR shall receive from the OWNER; and with retainage as provided in the prime contract. (If unit prices are agreed upon, consideration shall be according to schedule thereof hereto attached and signed by the parties; and estimated quantities shall depend upon the prime contract.)

3) SUB-CONTRACTOR shall furnish separate performance and payment bonds in penalty equal to the subcontract price, with conditions equivalent to CONTRACTOR'S bonds to the OWNER, and with surety acceptable to CONTRACTOR.

4) SUB-CONTRACTOR has inspected the work site, and does not rely upon representations of CONTRACTOR, beyond terms of the prime contract, etc., as to any matter incident to this sub-contract.

5) SUB-CONTRACTOR shall exercise due diligence and reasonable care to perform upon request by CONTRACTOR; and complete the sub-contract part of the work within such time as the work of CONTRACTOR or other sub-contractors shall not be delayed; and failure to do so will give CONTRACTOR, in addition to other legal remedies, the right to take over and perform the work, with SUB-CONTRACTOR'S personnel and equipment, and at SUB-CONTRACTOR'S expense.

6) CONTRACTOR shall not be liable for extras, unless allowed and paid for by the OWNER; and CONTRACTOR may assign to SUB-CONTRACTOR the right to recover for extras or claims from the OWNER, or claims against other sub-contractors, and be relieved of all liability therefor to SUB-CONTRACTOR.

7) CONTRACTOR shall not be liable for claims for delay damage by SUB-CONTRACTOR, unless written notice be given at time of the alleged delay,

APPENDIX—Continued

and written estimates thereof be furnished each week to CONTRACTOR; and shall, in no event, be liable for delays from conditions beyond control of CONTRACTOR.

8) SUB-CONTRACTOR shall indemnify CONTRACTOR from liability and expense from acts of omission or commission of SUB-CONTRACTOR, and from claims for unpaid bills of SUB-CONTRACTOR; and CONTRACTOR may withhold payments due hereunder to cover such indemnity.

9) Sales and payroll taxes upon material, labor and services procured by SUB-CONTRACTOR shall be his responsibility.

10) This sub-contract cannot be assigned without written approval of CONTRACTOR.

11) SUB-CONTRACTOR shall at all times protect and preserve material that is furnished by CONTRACTOR for installation upon the above project; and shall be responsible for such material from date of delivery to SUB-CONTRACTOR until project completion and final acceptance by the OWNER.

WITNESS execution hereof by the undersigned.

WITNESS:

GUY H. JAMES CONSTRUCTION CO.

Sec. & Treas. By _____
 CONTRACTOR

_____

E & R CONSTRUCTION CO., INC.

By _____
 SUB-CONTRACTOR

This Supplement constitutes a part of an agreement between Guy H. James Construction Co., an Oklahoma Corporation, CONTRACTOR, and E & R Construction Co., Inc., an Ohio Corporation of Cincinnati, Ohio, SUB-CONTRACTOR, for work to be performed in connection with the earth excavation, embankment and rock protection work for the Lock and Dam, Cordell Hull Project, Contract No. DA–40–058–CIVENG–64–618, dated June 26, 1964.

| Item No. | Description | Estimated Quantity | Unit Price | Amount |
|---|---|---|---|---|
| 1 | Mobilization & preparatory work | Lump sum | — | $ 17,900.00 |
| 2 | Lock cofferdam | 100,000 c.y. | 0.64 | 64,000.00 |
| 5 | Clearing & Grubbing | Lump sum | — | 11,000.00 |
| 6 | Common excavation | 1,480,000 c.y. | 0.64 | 947,200.00 |
| 15 | Filter Drainage | 5,200 c.y. | 5.28 | 27,456.00 |
| 16a | Compacted Impervious Fill | 86,000 c.y. | 0.14 | 12,040.00 |
| 16b | Additional rolling for compaction | 40 hrs. | 16.00 | 640.00 |
| 17 | Random Fill | 103,000 c.y. | 0.08 | 8,240.00 |
| 18 | Coarse rock fill | 8,100 c.y. | 2.00 | 16,200.00 |
| 19 | Fine rock fill | 2,000 c.y. | 2.00 | 4,000.00 |
| 20 | 12-inch concrete pipe | 260 l.f. | 4.00 | 1,040.00 |
| 21 | 15-inch concrete pipe | 240 l.f. | 5.00 | 1,200.00 |
| 22 | Bedding for Riprap | 7,500 c.y. | 5.28 | 39,600.00 |
| 23 | Riprap | 24,500 c.y. | 1.50 | 36,750.00 |

$1,187,266.00

APPENDIX—Continued

SUB-CONTRACTOR shall assume and comply with all obligations of CON-TRACTOR and perform completely all items of the above work according to applicable plans, specifications and related documents, with exception of a part of items 2, 18, 19 and 23 as hereafter set forth:

1(a) Item 2 shall include the work necessary to build an earth cofferdam or dike completely surrounding the Lock excavation area with the exception of the area protected by the existing cellular cofferdam and approximately following the existing 480 foot contour. It is the intent to protect the entire area from flooding by water below elevation 480, between Lock stations 7 + 00A and 10 + 00B (approximately).

(b) Item 2 shall also include the necessary protective earth cofferdams or dikes to protect all work in the lower approach channel from flooding by surrounding this area with a dike approximately following the 456 foot contour.

(c) It is intended to connect the land side of the excavation to the earth cofferdam on the river side with an earth dike at approximately station 10 + 00B–11 + 00B. In order to perform the rock excavation beneath this dike "in-the-dry" it may be necessary to build and remove this dike twice. This work is also considered part of item 2.

(d) The Estimated Quantity for item 2 of 100,000 cubic yards is based upon the following:

1. Earth cofferdam at elevation 480—16,000 cubic yards.

2. Earth cofferdam at elevation 456—8,000 cubic yards.

3. Material to be handled in building and removing connecting dike twice—38,000 cubic yards each move.

2. Rock materials required under items 18, 19 and 23 will be furnished to SUB-CONTRACTOR in stockpiles by CONTRACTOR and at points to be designated by CONTRACTOR, but within job site, at no cost to SUB-CON-TRACTOR. Item 19 may be loaded directly from CONTRACTOR'S batch plant into SUB-CONTRACTOR'S hauling units.

All quantities are estimated and payment will be made on the basis of actual quantities as paid by OWNER to CONTRACTOR except item 2, which will be paid on the basis of cross-section measurements of the completed coffer-dams and dikes when they are installed as directed to the lines, grades and slopes established by CONTRACTOR. Should SUB-CONTRACTOR elect to construct the protective dikes in slightly different locations or to higher elevations, with concurrence of CONTRACTOR, for convenience of SUB-CONTRACTOR, then no payment will be made for additional materials which may be required.

Removal of earth cofferdams and dikes constructed under item 2, and final cleanup shall be paid for under item 6.

SUB-CONTRACTOR shall perform his own pumping and control of water during his portion of the work. However, in case of flood or other emergency CONTRACTOR will have additional pumps available for use by SUB-

CONTRACTOR at SUB-CONTRACTOR'S operating expense and without rental.

CONTRACTOR will have pumping capacities as required by paragraph 2–03b of the specifications.

SUB-CONTRACTOR will compact construction dikes with a vibratory roller to assure as much compaction to the underlaying materials as possible.

SUB-CONTRACTOR will furnish his own lighting facilities for his work. However, should CONTRACTOR'S facilities be installed prior to completion of SUB-CONTRACTOR'S work, such facilities may be used by SUB-CONTRACTOR.

SUB-CONTRACTOR understands that time is of utmost importance. He agrees to commence work not later than July 20, 1964 and to prosecute his work as rapidly as possible. SUB-CONTRACTOR agrees to work a minimum of twenty (20) hours per day, six (6) days per week, weather permitting, and maintain a minimum average daily production in excess of 8,000 cubic yards per day during his excavation operations within the Lock area.

CONTRACTOR will furnish all field engineering layout work including necessary slope stakes.

CONTRACTOR agrees to pay SUB-CONTRACTOR under the terms and conditions of this agreement within 72 hours after receipt by CONTRACTOR of payment due him by OWNER.

Should the SUB-CONTRACTOR'S operations be interrupted by flood as covered by Section 2, page 2–5, paragraph 2–05 of the Contract Specifications, prior to the completion of that phase of his work and while his work is actually being carried on, CONTRACTOR agrees to pay SUB-CONTRACTOR one-third of the amount paid by OWNER under paragraph 2–05 of the specifications.

SUB-CONTRACTOR hereby acknowledges inclusion in this Sub-Contract of the provisions for:

(1) Nondiscrimination in employment, (2) All clauses in Standard Form 19a, and (3) All parts of paragraph 35 of the General Provisions of the standard construction contract entitled "Small Business Subcontracting Program", in addition to all the other provisions of the Prime Contract as set out in the Sub-Contract form.

GUY H. JAMES CONSTRUCTION CO.